In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3752

AFI M. APOUVIEPSEAKODA,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A78-863-025

ARGUED SEPTEMBER 20, 2006—DECIDED FEBRUARY 2, 2007

Before EASTERBROOK, *Chief Judge*, and POSNER and
EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* Afi Marie Apouviepseakoda is a
native and citizen of Togo who came to the United States
in 2002 without a valid visa. She was paroled into the
country while awaiting a final determination on her
applications for asylum, withholding of removal, and relief
under the Convention Against Torture (CAT). All of these
were denied by an immigration judge (IJ) who ordered
her removal, a decision subsequently affirmed by the
Board of Immigration Appeals (BIA). She now petitions for
our review, challenging both the IJ's finding that she
was not credible and the BIA's conclusion that the IJ's
handling of her hearing did not violate due process.

Apouviepseakoda says that her troubles began as a result of her husband's business relations with the mayor of Lomé, Togo's capital city. The mayor is a member of the *Union des Forces du Changement,* or UFC, an opposition political party to which Apouviepseakoda also belongs. Although her husband is not a member, Apouviepseakoda testified at her hearing that he had business contracts with the mayor to handle garbage collection for the city. She also vaguely explained that he had "financed" and "given money" to the mayor; it is unclear whether she was referring to something beyond his business obligations.

In any case, the mayor was jailed, and at some point the government became interested in Apouviepseakoda's husband. One day, a warning was received from a relative that government forces were looking for the husband, and he immediately left the country. Apouviepseakoda remained behind with the children and returned to their home.

She says that on the following day government troops came to her home, said nothing to her, and tore the place upside down looking for her husband before carrying away his picture and personal documents. They asked her about his whereabouts, and when she told them that she did not know where he was she says they beat her with their fists and batons for more than 30 minutes. When they left, they told her to call if her husband turned up. She says that she immediately went to a Lomé hospital for treatment, where she remained for 10 days.

Upon her discharge, Apouviepseakoda and her children stayed with her mother in another part of the country for a few days before sneaking into Ghana and eventually coming to the United States. Because she had already obtained passports and travel visas to the U.S.—she says for a vacation that they ended up not taking—she and her

children had the necessary documents to travel to the United States, which they did on October 10, 2001.[1]

But Apouviepseakoda did not apply for asylum in October of 2001. Instead, after 6 months, she left her children and returned to Togo in an effort, she says, to secure money and track down her husband, whom she believed to be in Ghana. She was assisted into the country by a friend, a lieutenant in the armed forces. She also testified that after her return to Togo, a warrant for her arrest was issued. She again stayed with her mother. Six days after she arrived, another warrant was issued, followed 3 days later by a summons requiring her to appear before the police. Notwithstanding these obstacles, Apouviepseakoda testified at her hearing that she returned to the Lomé hospital to see a gynecologist. Ultimately, she gathered some money and, finding no information on her husband, again obtained the assistance of her friend the lieutenant and left the country to return to the United States. This time, after landing in Chicago, she requested asylum and other relief. Pending the resolution of that application, she was paroled into the country.

After a hearing, the IJ issued a written decision finding that Apouviepseakoda's testimony was not credible and that her offered corroborating documentary evidence only raised additional questions. He found that she failed to establish eligibility for asylum, much less withholding of removal and CAT relief, and he ordered her removed to Togo. On appeal, the BIA adopted and affirmed the IJ's decision as to the merits and rejected

---

[1] Apouviepseakoda actually traveled to the United States from Togo three times: 2000 landing in Dallas, 2001 in New York, and 2002 in Chicago.

Apouviepseakoda's argument that the IJ's handling of her hearing constituted a denial of due process.

In this appeal, Apouviepseakoda repeats the arguments she made to the BIA. She first argues that the IJ's adverse credibility finding is not supported by substantial evidence and is based instead upon conclusions that bear no reference to the record. Second, she contends that the IJ violated her due process rights because he improperly took over her direct examination and began asking her questions to discredit her testimony. She also alleges that he wrongly stopped the hearing and should not have relied on an offer of proof from her counsel rather than listen to the live testimony of two witnesses who were present.

We turn first to her second argument, because if Apouviepseakoda was prejudiced by an unfair hearing we must grant her petition and remand for further proceedings. The BIA's determination that the immigration judge did not violate due process is a conclusion of law, *Podio v. INS*, 153 F.3d 506, 509 (7th Cir. 1998), which we therefore review *de novo*. *See Borca v. INS*, 77 F.3d 210, 214 (7th Cir. 1996).

The Fifth Amendment guarantees due process in removal proceedings, *Reno v. Flores*, 507 U.S. 292, 306 (1993). But before we get to the Constitution, there are statutory, 8 U.S.C. § 1229a(b)(4), and regulatory, 8 C.F.R. § 1240.1(c), provisions that govern the conduct of those proceedings. Apouviepseakoda has not challenged the constitutionality of these, and indeed she was wise not to, for we have already explained that "[a]ny proceeding that meets these requirements satisfies the Constitution as well." *Rehman v. Gonzales*, 441 F.3d 506, 508 (7th Cir. 2006); *see also Rodriguez Galicia v. Gonzales*, 422 F.3d 529, 538 (7th Cir. 2005). In other words, Apouviepseakoda, like many before her, has made the mistake of employing "flabby constitutional arguments to displace more

focused contentions," *Rehman*, 441 F.3d at 508-09; *see also Boyanivskyy v. Gonzales*, 450 F.3d 286, 292 (7th Cir. 2006); *Pronsivakulchai v. Gonzales*, 461 F.3d 903, 907 (7th Cir. 2006), and is really arguing that the IJ's hearing violated these statutory and regulatory provisions. We shall treat her argument as though it were properly made in this fashion.

Under those provisions, a lawful removal proceeding is one in which "[t]he immigration judge shall receive and consider material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing," 8 C.F.R. § 1240.1(c), and "the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government . . . .", 8 U.S.C. § 1229a(b)(4)(B). In order to succeed in challenging the legality of such a hearing, the alien must show not only that her "reasonable opportunity" was denied, but also that she was prejudiced. *Rehman*, 441 F.3d at 509.

Apouviepseakoda argues that she was denied the reasonable opportunity to be heard because the IJ "demonstrated impatience, hostility, and a predisposition to deny" her claims, took over her direct examination so as to limit her time to testify on her own behalf, and improperly asked for an offer of proof from her counsel rather than make additional time for the testimony of two witnesses.

Congress has specifically authorized immigration judges to operate in the dual role of decisionmaker and prosecutor, *see* 8 U.S.C. § 1229a(b)(1) (granting the immigration judge the authority to "administer oaths, receive evidence, interrogate, examine, and cross-examine the alien and any witnesses"). The IJ has "broad discretion to control the manner of interrogation in order to

ascertain the truth," *Iliev v. INS*, 127 F.3d 638, 643 (7th Cir. 1997), but "that discretion is bounded by the applicant's right to receive a fair hearing." *Podio*, 153 F.3d at 509; *cf. LeTourneur v. INS*, 538 F.2d 1368, 1370 (9th Cir. 1976) ("That this dual role of the [immigration judge] is fair and proper under established standards of due process is clear.").

"We have previously given impatient and inappropriate judges a pass on the theory that '[a]n immigration judge is permitted to interrogate, examine, and cross-examine the alien and any witnesses,'" *Giday v. Gonzales*, 434 F.3d 543, 549 (7th Cir. 2006) (citation omitted), because "although one hopes that an immigration judge will perform these tasks with patience and decorum befitting a person privileged with this position, such failures to do so do not in and of themselves create due process violations." *Diallo v. Ashcroft*, 381 F.3d 687, 701 (7th Cir. 2004).

Although we have never held that such circumstances alone establish the denial of a reasonable opportunity to be heard, the closest cases are those in which "the questioning becomes so aggressive that it frazzles applicants and nit-picks inconsistencies" until a petitioner "became so distraught that the immigration judge was forced to pause the proceedings to give 'the [non-citizen] a chance to collect herself,'" *Giday*, 434 F.3d at 549; *see also Rodriguez Galicia v. Gonzales*, 422 F.3d 529, 539 (7th Cir. 2005). Instead, we have been more likely to find a denial where an IJ bars "complete chunks of oral testimony that would support the applicant's claims," *Kerciku v. INS*, 314 F.3d 913, 918 (7th Cir. 2002). This is not to say that the specific nature of the IJ's challenged actions is determinative; "[i]n the end, we must determine whether, given the totality of circumstances, the petitioner had a full and fair opportunity to put on her case." *Rodriguez Galicia*, 422 F.3d at 538.

With respect to Apouviepseakoda's hearing, we agree that the IJ's conduct was hardly a model of patience and decorum.[2] From the beginning of the hearing, the IJ demonstrated intemperance, telling her: "if you force me repeatedly to ask you to raise your voice I will not be pleased. And also might indicate the posture of your case as well." Likewise, his efforts at cross-examination occasionally took on an unseemly, mocking tone, such as when he sought corroboration for her testimony that her husband owned a radio station:

Q   I see. Do we have anything to verify that that was true other than your statements?

A.   I have a photo.

Q   I see. I see a photo too. I have photographs also in high school where I took pictures with a radio trans-

[2] So we agree, at least to some extent, with our dissenting colleague's view of the IJ's performance. Yet the heavy criticisms our colleague unloads on the IJ (his handling of the case was "appalling" and the logic "gaps" in his 14-page decision are "yawning chasms") are farther than we want to go. But we do agree with the dissent's statement that: "One cannot but sympathize with the difficulty under which the immigration judges labor quite apart from their horrendous workloads, which Congress and the Justice Department have done nothing to try to alleviate." The system is in turmoil as the nation's immigration judges (218 at last count) struggle to complete some 350,000 cases a year, all without law clerks, bailiffs, stenographers, and often competent lawyers and interpreters. Often, immigration judges are hearing three contested hearings a day and up to 15 in a week. As Judge John M. Walker, Jr., of the United States Court of Appeals for the Second Circuit, told the Senate Judiciary Committee last April, "I fail to see how immigration judges can be expected to make thorough and competent findings of fact and conclusions of law under these circumstances."

mitter there. Does that mean that that is an operating business because you have a photograph?[3]

Also troubling is his incredulity at the different nature of marital relations in Togo:

A. Yes. In Africa it is very difficult for a woman to be involved in her husband's business. Men conduct their business in a different way.

Q. I see. So, when he goes to work in the morning you don't know where he's going, is that what you're saying? He doesn't tell you.

A. He tells me that he goes to work but I don't follow him to see where he, he's would go.

Q. That's amazing.

---

[3] In fact, we are uncertain whether this particular exchange was even necessary when Apouviepseakoda might have been able to corroborate this part of her testimony by directing the IJ to the radio station's Web site (also found by a simple Google search of "sport FM Togo," which provides the link as the first result on its list). The Web site offers other information (in French) that might have been useful for the IJ to know as well, such as Apouviepseakoda's own position as "Membre du Conseil d'administration" of the radio station (actually, her biography on the Web site calls her the vice-president); the fact that the station began broadcasting on September 14, 2001 (i.e., 3 days before Apouviepseakoda says her husband fled the country and 4 days before she was allegedly visited by the soldiers); her previous experience as general director of the "commerce establishment" El Shadai in Lomé (which may be a pharmacy, *see* Annuaires Afrique République Togolaise, PHARMACIE EL SHADAI, at http://www.togophonebook.com/ sante/pharmacies/ pharmacie-el-shadai-60486.html (last visited Nov. 17, 2006); or that "she has used the radio establishment as the launching point for her success." *See* Membre du Conseil d'administration: APOUVIE Afi Marie, *at* http://inovix.africa-web.org/sportfm/akouvi.htm (last visited Nov. 17, 2006).

JUDGE TO INTERPRETER

> Q.  You want to tell her that that's amazing. You want to tell her.

But we do not believe that these flaws give rise to anything approaching the "close case" described in *Giday*. There is nothing in the record to suggest that Apouviepseakoda was frazzled or distraught as a result of the IJ's actions. And although Apouviepseakoda complains that the IJ asked a majority of the questions at her hearing, we have repeatedly emphasized that an IJ's frequent interruptions of or assumption of control over testimony do not deprive a hearing of fairness where those actions are designed to focus the hearing and exclude irrelevant evidence. *See*, *e.g.*, *Rodriguez Galicia*, 422 F.3d at 538; *Kerciku*, 314 F.3d at 917-18; *Podio*, 153 F.3d at 510; *Kuciemba v. INS*, 92 F.3d 496, 501 (7th Cir. 1996).

Our review of the record indicates that this was the aim of the IJ's efforts. Although the form of his interruptions was occasionally jarring, their function was to focus Apouviepseakoda's testimony on matters that either needed clarification or went to the heart of her credibility. Early in the hearing, for example, after some initial confusion as to whether Apouviepseakoda had been previously married to another man, the IJ asked about children by this first husband. At that point it became clear that she had been referring to a first, unofficial marriage to her current husband prior to a formal, legal one in 1999. Had the IJ not interrupted to ask these questions, he would have misunderstood the length of her relationship to her husband—a key figure in her asylum application.

The IJ next interrupted her for more details about her work for the opposition party. After Apouviepseakoda stated that she had participated in the distribution of

documents for the UFC, the IJ wanted more details about these documents and whether she could corroborate her testimony with any copies. Later, when her counsel elicited testimony that she had contributed money to the opposition, the IJ interrupted to ask if she had a formal title within the party. Again, the questions were designed to test her assertions that the government was targeting her for her political opinion.

As the IJ eventually came to assert a more dominant role in the hearing, he more readily assumed the statutorily authorized role of interrogator, pressing Apouviepseakoda for details about her husband's work and his support of the mayor in an effort to test her credibility on those important issues. Notably, however, the IJ continued to defer to her counsel to direct the topics of discussion in the hearing. The IJ's extended questions about her husband's professional activities followed questions by counsel that raised that aspect of her application. When the IJ was finished, he turned questioning back to Apouviepseakoda's counsel. Counsel next asked about her family, and the IJ proceeded to question her in that area. Counsel turned next to her husband's ties to the opposition; Apouviepseakoda's counsel asked seven questions, and the IJ interrupted where he felt he needed clarification. Counsel again was directed to proceed and again raised a new set of issues: the visit of soldiers to Apouviepseakoda's home. This time, counsel asked the majority of the questions, and the IJ interrupted as necessary.

The hearing followed this pattern throughout. Apouviepseakoda's counsel would draw attention to a particular set of issues and ask some initial questions; inevitably the IJ would interrupt for clarification or to test the consistency and logic of her explanations. When the IJ was satisfied or out of questions, counsel could proceed and either raise unasked questions or begin questioning Apouviepseakoda on a new topic.

The IJ's approach did not impede Apouviepseakoda's "reasonable opportunity" to be heard. The record suggests that her hearing lasted over 6 hours, and even as time dragged on, the IJ purposefully extended to her counsel several clear opportunities to bring out anything that he felt had been missed. Then, when given the opportunity to engage in redirect questioning, counsel did not suggest that he needed more time to present evidence; he instead indicated that he had only two remaining questions, both of which he was able to ask. Next, the IJ gave him an opportunity to present the offer of proof regarding his client's two witnesses. This was done without objection. After describing the intended testimony of these witnesses, counsel got another opportunity to offer information. When he declined that chance, he was afforded a closing statement. Even when that had ended and the government had its own say, the IJ offered counsel "the very last word." He took advantage of this as well, entering a final statement on Apouviepseakoda's behalf. Finally, when he was finished, the IJ asked him one more time: "[A]re you through?" Only when counsel declined this final opportunity did the hearing come to an end.

Standing alone, then, the IJ's alleged lack of decorum and his interrogating approach did not deny Apouviepseakoda a reasonable opportunity to be heard. If, however, Apouviepseakoda is right that the IJ also improperly "bar[red] complete chunks of oral testimony that would support [her] claims," *Kerciku*, 314 F.3d at 918, she would have a better case. *See Rodriguez Galicia*, 422 F.3d at 539. Two corroborating witnesses, Apouviepseakoda's daughter Yawa Akoda and Comlan Anani, an expert in Togo politics, appeared at her hearing on her behalf with the intention of offering live testimony in support of her claims. But in lieu of taking that testimony, the IJ accepted an offer of proof regarding its intended content—a decision which prompted no objection from her counsel.

The offer of proof indicated that Yawa Akoda was to testify about the beating her mother suffered, the ransacking of their house by soldiers, the visit her mother paid to the hospital, and her own stay with her grandmother during that hospital visit. The expert on Togo politics, Anani, was "just background." Anani would have testified regarding the political situation in Togo and the atrocities committed there and was also aware of past support provided to the opposition by Apouviepseakoda's husband. Because he had lived in the United States since 1996, there was no indication that he had specific knowledge of the key events in Apouviepseakoda's story.

The typical context in which we have found fault with an IJ's decision to deny corroborating witness testimony has arisen where an IJ has "made up his mind about the case and was subsequently unwilling to listen to any testimony," despite the diligent insistence of the alien's counsel that the testimony speaks directly to the questions the IJ is supposed to evalute in making the decision. *Kerciku*, 314 F.3d at 918; *see also Boyanivskyy*, 450 F.3d at 293; *Pronsivakulchai*, 461 F.3d at 907-08. Here, of course, there was no objection by counsel to the IJ's decision not to take the live testimony.

But Apouviepseakoda argues that our decision in *Rodriguez Galicia* suggests a different standard. There, counsel failed to object to presenting an offer of proof instead of taking the live testimony of two witnesses who were experts on human rights and Latin America (Rodriguez feared persecution in Guatemala). Notwithstanding that failure, we held that the IJ's refusal to hear that testimony denied Rodriguez of a reasonable opportunity to present evidence. 422 F.3d at 535, 538-40.

Apouviepseakoda contends that her case mirrors *Rodriguez Galicia*. But her view misreads our fundamental concern with the IJ's conduct in that case: The IJ unrea-

sonably imposed, without any rational explanation, a very short time (about one hour) for Ms. Rodriguez to present her case. 422 F.3d at 533. It was, to a major extent, the time limit (which led to the refusal to take live testimony) that denied Ms. Rodriguez a reasonable opportunity to present her case. As we noted, "More troubling . . . was the strict time limit that the IJ imposed on Ms. Rodriguez, which in turn prevented her from presenting the readily available testimony [of her corroborating witnesses] . . . ." 422 F.3d at 439. By contrast, as we have explained, Apouviepseakoda's hearing lasted more than 6 hours. And although time is not the only factor to consider in evaluating the reasonableness of an opportunity to present evidence, where there is lots of time, as there was here, it certainly is a strong indicator that a petitioner received a "reasonable opportunity" to make her case.

So, in summary, we cannot say that Apouviepseakoda was denied a reasonable opportunity to present evidence in support of her application. Her counsel had opportunities to elicit more direct testimony, rebut the government's case, and offer a summarizing final statement. Also, the taking of an offer of proof in lieu of live testimony met with no objection. When all is said and done, we conclude that Apouviepseakoda had a fair, albeit less than perfect, hearing. And besides that, to eventually prevail on her claim, Apouviepseakoda would have to show prejudice, yet her allegations of prejudice are conclusory[4] at best.

---

[4] Apouviepseakoda says only that if the IJ had done things differently "she would have had the opportunity to develop her testimony and bring forth crucial aspects of her claim," and "the IJ would have had no basis in which to make his adverse credibility finding."

We turn next to whether the IJ's adverse credibility determination is supported by substantial evidence. Although we normally review the decision of the BIA, where, as here, that opinion merely supplements the IJ's opinion, we review the latter. *Niam v. Ashcroft*, 354 F.3d 652, 655-56 (7th Cir. 2004). An IJ's finding regarding credibility is entitled to highly deferential review, *Georgis v. Ashcroft*, 328 F.3d 962, 968 (7th Cir. 2003); we look only for specific, cogent reasons that bear a legitimate nexus to the IJ's finding. *Ayi v. Gonzales*, 460 F.3d 876, 880 (7th Cir. 2006). A credibility finding is overturned only under extraordinary circumstances, *Oforji v. Ashcroft*, 354 F.3d 609, 613 (7th Cir. 2003), although we will not uphold credibility determinations based on speculation or conjecture rather than record evidence. To prevail, Apouviepseakoda is required to show "not merely that the record evidence supports a conclusion contrary to that reached . . . but that the evidence compels that contrary conclusion." *Bradvica v. INS*, 128 F.3d 1009, 1012 (7th Cir. 1997) (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)).

There have been plenty of recent examples of the kinds of cases in which an IJ's findings do not pass muster, such as when "[the immigration judge's] analysis flatly failed to engage with the evidence presented to him," *Niam v. Ashcroft*, 354 F.3d 652, 655 (7th Cir. 2004), "[t]here is a gaping hole in the reasoning of the board and the immigration judge," *Kourski v. Ashcroft*, 355 F.3d 1038, 1039 (7th Cir. 2004), the opinion "fails to build a rational bridge between the record and the agency's legal conclusion," *Mengistu v. Ashcroft*, 355 F.3d 1044, 1047 (7th Cir. 2004), "[i]t is impossible to follow the immigration judge's reasoning process" because of the brevity of the opinions below, *Guchshenkov v. Ashcroft*, 366 F.3d 554, 557, evidentiary material "was . . . completely ignored by the immigration judge," *Yi-Tu Lian v. Ashcroft*, 379 F.3d 457, 462 (7th Cir. 2004).

This case does not rise to that level. The IJ offered a number of discrete reasons for his adverse credibility finding, and he pointed out several flaws in Apouviepseakoda's corroborating evidence.

For example, Apouviepseakoda submitted into evidence several photographs that she claims were taken during her 10-day stay at the hospital in September 2001 following her alleged beating by soldiers. These photographs (she said they were taken by her cousin "as a souvenir"), however, offer no visual evidence of *any* wounds, much less of the sort of external injuries one would expect to find on a person only days removed from a serious beating. The photographs also all bear the date stamp "03 4 16," although the "03" part of the stamp is difficult to see. Asked about the photographs at the hearing, Apouviepseakoda offered little, other than to say that she had suffered serious injuries to her head and hip. (She wears a headdress and gown in the photographs and appears from her various poses to be reasonably mobile—there is no indication of any bandages.) She explained that her other injuries—"inflammations" suffered from being severely beaten with batons—had "disappeared." Asked why the date stamp apparently referred to April 16 of 2003 if the photographs were taken in September 2001, she offered unhelpfully that "I think it's just a date because I wasn't in Lomé in the year 2003."[5]

---

[5] Apouviepseakoda says that she submitted the photographs with her asylum application in August 2002, which would preclude the 2003 date. This may be the case, although the administrative record is not exactly clear. Exhibit 4 of the record contains the asylum application and certificate of service, as well as scores of pages of other exhibits labeled alphabetically that may or may not have been included when the original

(continued...)

The IJ also focused upon Apouviepseakoda's ability to return to and stay in Togo without difficulty in April and early May of 2002. Despite the fact that warrants had been issued for her arrest, Apouviepseakoda entered and departed the country at Togo's main airport while using her official Togolese passport. Questioned about this, she explained, as we have said, that a family friend who was also a soldier aided her entry and exit from the country. Her asylum application, however, made no mention of this assistance, and the IJ found it strange that she had not contacted this soldier for help after the 2001 beating. Apouviepseakoda explained that she had been too distraught to think of it. While in the country, she

[5] (...continued)
application was filed: the application itself does not refer to these documents or suggest additional attachments; the exhibits offer no stamp to certify their filing with the original application; and they do not carry any page numbers that would suggest they are part of a package. Finally, while some of the documents in these exhibits are dated based on when they were translated into English, the photos offer no indication of when they were placed there.

We think the IJ did not, as the dissent contends, conclusively find that the photos were taken in 2003. He was simply troubled by what he believed was an inconsistency between the date stamp and her testimony, and by her inability to offer what he thought was a satisfactory explanation to address his concerns. It was Apouviepseakoda's duty to explain the situation, and her failure to do so could properly be considered by the IJ in making his credibility determination. It could be that the date stamp is inaccurate: Apouviepseakoda says she submitted the photographs with her asylum application in August 2002, which would preclude the 2003 date. Notably, however, the original photographs were not made available to the IJ at the hearing, and all present were forced to review copies from which everyone (including us, upon review of the record) had difficulty making out the year (though not the numbers "4 16").

stayed at her mother's house, which was 2 hours distance from her own in Lomé. She says she feared what might happen if she returned there. But at her hearing she revealed for the first time that during this time in Togo she went to Lomé in any event to be treated for an infection by a gynecologist at the same hospital—the government hospital—that she had visited after the alleged beating.[6]

Also troubling to the IJ was Apouviepseakoda's testimony regarding why the soldiers who ransacked her home and took away her husband's documents did not also take her and her children's passports if they too were targets. Her answer raises questions about both her credibility and whether anyone other than her husband was even a target:

> Q. Can you tell me why the soldiers when they allegedly ransacked your house did not take the passports that you and your children had?
>
> A. They didn't find the passports.
>
> Q. I see. They did find your husband's documents but they didn't find your documents, is that what you're saying or your children documents?
>
> A. We had two bedrooms. One for me and one for my husband and we kept documents separately. One of the sons had traveled with my husband abroad and

---

[6] This *April* visit to a *gynecologist* prompts us to note a coincidence not recognized by the IJ. Two of his doubts about the September 2001 hospital visit arose from inconsistencies in submitted documentary evidence: We have already mentioned the photographs, but the IJ also wondered about the physician's stamp on a medical certificte offered to prove the September 2001 visit; the stamp listed the doctor's specialties as "Gynecology-Obstetrics, General Medicine."

he had a passport so they did find that passport but they didn't take it.[7]

The IJ also believed that she was shifting her story regarding the basis for the government's concern with her and her husband. At various points she suggested (1) that she was being targeted for her own UFC membership and her past work for her organization distributing fliers, (2) that the danger stemmed from her husband's widely known business connections and friendship with the jailed mayor, and (3) that the troubles began after a local magazine article named her husband as a financial contributor to the mayor.[8]

There is more. The IJ commented on the medical certificate submitted by Apouviepseakoda from her hospital

---

[7] Indeed, although the IJ did not ultimately rule on whether Apouviepseakoda's claims, if true, established past persecution or a well-founded fear of persecution, it seems to us that the bulk of her story focuses on the possible persecution of her husband—not of her. Although she was inconsistent, Apouviepseakoda's testimony usually suggested that she was targeted because of her husband and not from her own support of the opposition. With this in mind, it is telling that, as she explained in her testimony, when the soldiers came to her house they said nothing to her and instead entered her husband's room and ransacked his things, taking his personal papers away and asking her only if she knew where he was. We have explained before that a noncitizen "cannot rely solely on the persecution of her family members to qualify for asylum." *Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003).

[8] On their face these various accounts are not necessarily inconsistent with one another. But there is more to a hearing than just the transcript, and the IJ may have decided that she was modifying her story in an effort to strengthen her claims. Such are the intangible factors that underlie our practice of deferring to an IJ's credibility findings.

stay after the alleged beating. It is signed and dated on September 18, 2001, yet appears to know the future, explaining that Apouviepseakoda was released on September 28, 10 days later. Finally, the IJ referred to an August 6, 2003, letter to Apouviepseakoda from her father that described difficult conditions in Togo, including troubles experienced by some of her extended family, and warned her to be careful about with whom she spoke and interacted in the United States. Yet, the letter made no mention of his daughter's alleged beating or the warrants in Togo for her arrest.

Taking all of this together, we cannot say that the IJ's adverse credibility finding is so deeply flawed. This is not to say that the IJ's analysis is a model to be emulated—for example, his apparent expectation that Togolese medical practice mirrors the way things are done in the U.S. strikes us as particularly odd. But we can find no basis to conclude that—as our standard of review requires—the record evidence *compels* the conclusion that Apouviepseakoda was credible and that the IJ was obligated to believe her testimony.

Before signing off, and at the risk of repeating ourselves, we add a few comments concerning the bookend paragraphs of our esteemed colleague's vigorous dissent. In his opening paragraph, he says the primary issue is whether the IJ's determination "that the petitioner lied" is supportable. But "lied" is a rather harsh word to use in emotionally charged immigration cases. Obviously, the petitioner would rather live in America than in Togo. Who can blame her? And, like all petitioners, she knows her chances of winning an asylum claim are significantly enhanced if her story of persecution is made more compelling. In a situation like this, even if a petitioner doesn't exactly "lie," the temptation to embellish and exaggerate a story is obvious. Immigration judges recognize this. So should august court of appeals judges.

In his concluding paragraph, our colleague says we are "wrong to think" that as a reviewing court we "should uphold immigration judges' incompetent findings of fact." With all due respect, this is not what we are doing. The standard of review we must apply in these cases has been endlessly repeated: an immigration judge's "credibility findings are entitled to highly deferential review" and "adverse credibility findings are overturned only under 'extraordinary circumstances.'" *Mansour v. INS*, 230 F.3d 902, 905 (7th Cir. 2000), and *Oforji*, 354 F.3d at 613. We should honor these pronouncements, not merely mouth them and then proceed to pick apart what an IJ has done. Here, it seems to us that two related matters, which the IJ pointed out, augur against setting aside his findings. Ms. Apouviepseakoda traveled from Togo to America three times, arriving first in Dallas in 2000 and again in New York in 2001. After each of these trips—the second after a 6-month stay here which followed, she said, a terrible beating—she returned to Togo. Was the IJ compelled to believe that these return trips are what a person in dire fear of persecution in Togo would do? We think not. As for the beating, Ms. Apouviepseakoda testified that the soldiers "hit her with their fists and batons and dragged her along the floor" for some "30 minutes." From her description, one would think she was beaten to within an inch of her life. Yet, as depicted in the photographs taken at a hospital a day or two later, she shows nary a scratch.

The IJ spent 6 hours in a hearing room, face to face, with Ms. Apouviepseakoda. We have never met her. Given our standard of review, and the matters recalled by the IJ, we don't believe it's fair to say that his conclusion was so far off base that this case must be sent back, as our colleague argues, for "a new hearing before a different immigration judge."

For the foregoing reasons, Apouviepseakoda's petition for review of the BIA's decision is DENIED.

POSNER, *Circuit Judge*, dissenting. The majority opinion is mainly devoted to refuting the petitioner's due process claim and scants the more serious issue, which is whether the immigration judge's determination that the petitioner lied in testifying that she was a victim of persecution in her country of origin can be said to be supported by substantial evidence.

Ordinarily the determination by the trier of fact that a witness is not telling the truth is conclusive on a reviewing court. But there are exceptions. One is where the trier of fact is a judge or other judicial officer, rather than a jury (a jury gives no explanations for why it believed or disbelieved a particular witness), and gives erroneous or illogical reasons for his determination; and then the case must be remanded unless the witness is unimportant or it is apparent that the trier of fact would have reached the same conclusion on rational grounds. We have repeatedly invoked this principle in asylum cases. *Ayi v. Gonzales*, 460 F.3d 876, 883 (7th Cir. 2006) (another Togo asylum case); *Pramatarov v. Gonzales*, 454 F.3d 764, 765-66 (7th Cir. 2006); *Oforji v. Ashcroft*, 354 F.3d 609, 613 (7th Cir. 2003); see also *Allord v. Barnhart*, 455 F.3d 818, 821-22 (7th Cir. 2006); *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir. 1999). It is consistent with more general formulations of the standard of review of credibility determinations, such as that the determination cannot be overturned unless "the record compels a contrary conclusion." *Bradvica v. INS*, 128 F.3d 1009, 1012 (7th Cir. 1997). The majority opinion quotes *Oforji v. Ashcroft*, *supra*, 354 F.3d at 613, for the proposition that "adverse credibility findings are overturned only under 'extraordinary circumstances,'" but ignores our further statement that credibility determinations "must be supported by 'specific, cogent reasons.' In addition, these reasons must 'bear a legitimate nexus to the finding'" *Id*. A similar qualification in *Mansour v. INS*, 230

F.3d 902, 906 (7th Cir. 2000), is omitted from the majority's quotation from that opinion as well. The majority accuses me of merely "mouth[ing]" the standard of review and proceeding to "pick apart" the immigration's judge analysis. The majority's response is to oversimplify the standard of review by selective quotation and then to perform reconstructive surgery on that analysis.

In a close case, when the immigration judge fails to ground his finding on plausible observations of demeanor, plausible inferences from inconsistencies in the witness's testimony, or other clues to dishonest or mistaken testimony, we have to overturn his determination. Review of credibility determinations is deferential, but deferential review is not supposed to mean rubber stamping. The Immigration Court is not small-claims court; mistaken rejection of an asylum claim can doom the claimant, literally. And as we know from another recent asylum case involving Togo, *Kantoni v. Gonzales*, 461 F.3d 894, 896-97 (7th Cir. 2006), the testimony of Apouviepseakoda, if believed, would establish her right to asylum. See also *Ayi v. Gonzales*, *supra*.

As is apparent from his opinion and from the transcript of the hearing, the immigration judge, O. John Brahos, has, once again, "doubted the applicant's credibility on grounds that, because of factual error, bootless speculation, and errors of logic, lack a rational basis." *Pramatarov v. Gonzales*, *supra*, 454 F.3d at 765. We topped off another highly critical discussion of Judge Brahos's reasoning by saying: "we have no idea why the IJ ruled as he did." *Gomes v. Gonzales*, No. 03-3020, 2007 WL 63973, at *6 (7th Cir. Jan. 11, 2007). As for the opinion of the Board of Immigration Appeals, its gist, so far as bears on the issue of credibility, is the following unhelpful sentence: "While no single concern would lead us to conclude that the [asylum applicant's] story is untrue, the constellation of problems described by the Immigration Judge lead

us to agree that the [asylum applicant] has not met her burden of proof to establish eligibility for relief from removal." So all that we have to go on in assessing Apouviepseakoda's claim is Judge Brahos's opinion.

The opinion declares her testimony "vague and inconsistent with the documentary evidence and it appears exaggerated" and riven with "inconsistencies and implausibilities." She had testified that the dictator of Togo had imprisoned the mayor of her town after discovering that he was supporting the opposition to the dictator, and that because her husband supported the mayor he became a target of the dictator as well. Judge Brahos found this statement "unconvincing and vague," but did not say why beyond remarking that "although [she] was allegedly a member of the UFC (the opposition), she does not allege that she was targeted for this membership but rather for her husband's support of the Mayor." Opposing a dictator is often bad news for the opponent's family. But it would make no difference to the validity of her claim for asylum whether she had been persecuted on account of her own politics or those of her spouse; it would still be politically motivated persecution. E.g., *Toure v. Attorney General*, 443 F.3d 310, 320-21 (3d Cir. 2006); *de Belbruno v. Ashcroft*, 362 F.3d 272, 284-85 (4th Cir. 2004); *Khem v. Ashcroft*, 342 F.3d 51, 53-54 (1st Cir. 2003); *Navas v. INS*, 217 F.3d 646, 659 n. 18 (9th Cir. 2000). This is not an esoteric point, but Judge Brahos overlooked it.

The petitioner testified that soldiers had ransacked her house and taken many photographs and other documents but not her passport or her children's passports. The judge found this testimony unconvincing because "the only explanation provided by [her] is that the soldiers must not have found the passports." That was speculation, of course; but how could she have offered any other explanation? She could not know the soldiers' motives or methods. And the immigration judge, noting corrobo-

ration for the ransacking, did not find that it had not occurred. Of course the fact that the soldiers did not take her documents could be evidence that she was not an object of the dictator's wrath after all. But that was not the inference that the immigration judge drew; rather he thought that her failure to nail down the reason for the soldiers' not having taken her documents showed she was lying. That makes no sense.

The judge came down particularly hard on the petitioner's testimony that she had been hospitalized for injuries that she had sustained when beaten by other soldiers. He pointed out that the hospital certificate that she tendered as evidence of her hospitalization is dated September 18 but states that the petitioner was seen "in consultation from September 18 to September 28." That is a genuine anomaly, though similar mistakes can be found in medical records even in the United States, and the judge's principal concerns lay elsewhere. The doctor who had signed the hospital certificate is identified on it as practicing in the fields of "Gynecology-Obstetrics-General Medicine." The judge said that "when questioned why [the petitioner] was treated by a gynecologist for wounds and bruises to her body, [she] testified that she was not treated by a gynecologist. Her testimony, thus, is inconsistent with the documentary evidence she submitted to support her claim." (She testified that she had been treated at the hospital by women and men but not by a gynecologist.) The fact that a gynecologist signed the hospital certificate doesn't mean that he treated her, and though there is a prescription in the record that is stamped with his name, it is not signed. Moreover, "gynecologist" is not a complete description of him because it describes him as practicing general medicine as well as gynecology, and the petitioner may have been thinking of the former when she testified that she had not been

treated by a gynecologist. That would be consistent with the diagnosis noted on the certificate of "chronic insomnia, psychosis, and total [illegible] cerebral edema," none of which are gynecological conditions. It would not be surprising to discover that in a country as poor as Togo the medical profession is less specialized than it is in the United States.

The immigration judge questioned the diagnosis of "cerebral edema" because the petitioner "was wearing a scarf covering her head in the photographs [taken in the hospital, and submitted by her to the court] making it impossible to determine whether or not she had any head injuries." The implication is that if she really had had cerebral edema, she would have exhibited it by baring her head. But there is no basis for thinking that the purpose of the photographs was to create evidence for a future asylum (or other) proceeding. Moreover, the other women in the photograph are also wearing head-dresses, which is common in Togo (see, e.g., www. togoaid.com/ipw-web/b2/index.php?cat=1, visited Jan. 8, 2007), though these women had nothing to hide. Further-more, cerebral edema is a swelling of the brain, not of the head. There is no reason to think that if the petitioner had had cerebral edema there would have been a visible injury. And, by the way, psychosis and insomnia are among the symptoms of cerebral edema.

The majority opinion does a variation on the immigra-tion judge's theme by pointing out that in the photo-graphs Apouviepseakoda "shows nary a scratch." Well, of course; she is fully clothed in the photographs.

The immigration judge emphasized that the doctor who signed the certificate is said on it to have seen Apouviepseakoda "in consultation" rather than to have "treated" her. The emphasis is odd, given that the judge disbelieved her testimony that she had not been

treated by the doctor. He seems to have thought both that consultation meant treatment and that the reference to consultation meant she hadn't been treated at all and therefore must not have been injured. That is a great muddle, but in any event one would have to know a good deal about the medical profession of Togo to attach any weight to the distinction between consultation and treatment. Speculating that the petitioner's injuries may have been due to an automobile accident (suggested by no one, and inconsistent with the judge's belief that she had not been injured), the judge said that "some injuries are a result of a complication because of pre-existing condition and the treating doctor would have that information in his report and because you submitted to us a consulting doctor's report I have to give it very little weight."

He seems to have formed the opinion—on what basis he does not say—that the medical protocols of Togo are identical to those of the United States. Reading his opinion you might think the petitioner had been hospitalized in Truro rather than in Togo. Besides being a brutal dictatorship, Togo has a per capita GDP of $1,600 (2005) which is only 4 percent of the per capita GDP of the United States. Pertinent here is our reminder in *Banks v. Gonzales*, 453 F.3d 449, 453 (7th Cir. 2006), that "an IJ is not an expert on conditions in any given country, and *a priori* views about how authoritarian regimes conduct themselves are no substitute for evidence—a point that we have made repeatedly, but which has yet to sink in." See also *Kantoni v. Gonzales, supra*, 461 F.3d at 897.

Judge Brahos expressed great concern that two of the hospital photographs submitted by the petitioner are stamped "03 4 16," which he interpreted to mean that they had been taken in 2003, whereas the hospitalization was in 2001. He overlooked the petitioner's claim that the photographs had been submitted with her asylum

application in 2002, making it physically impossible that they had been taken in 2003. As the majority opinion points out, the situation with the photographs is "not exactly clear," in part it seems because the Department of Homeland Security failed to submit legible copies of the photos. But the immigration judge did not question the petitioner's claim to have submitted the photos in 2002, so that, as the record stands, whatever "03 4 16" signifies, it is not the date on which the photographs were taken. The judge also speculated without any basis in the record that the photographs had been taken in the United States. Had they been taken in the United States, they would be more likely to have a correct date on them.

The immigration judge thought it incredible that the petitioner would have returned to Togo, as she did, for a visit after fleeing it. But she testified that she and her husband (who had fled to Ghana) had been members of the Togo bourgeoisie, and that she had money there (as well as her mother there, with whom she stayed on her visit), and was also looking for her husband. The judge thought that since the husband was in Ghana, his wife would not have sought his whereabouts in Togo. Yet he credited testimony that Ghana has been arresting enemies of Togo's dictator and sending them back to Togo for trial, and this was consistent with the petitioner's testimony that her husband was hiding in Ghana. It could also explain why she was inquiring about him in Togo rather than in Ghana. Family or friends of the couple in Togo might have information about where he was hiding.

The judge thought the petitioner wouldn't have dared return to Togo for a visit had she really feared persecution. But she testified that she'd been able to enter and leave the country without incident because she had had the protection of an officer, who escorted her through customs. That is entirely plausible in as disordered a

polity as Togo. The judge also thought it incredible that the petitioner could have been a member of the opposition party since 1995, as she testified, without having been arrested. But it is uncontradicted that she and her husband had the protection of the mayor of their town before the mayor's fall from grace.

In pointing out these things, I am not being picky. I am not guilty of lack of charity in interpretation. The gaps in logic in Judge Brahos's opinion are yawning chasms.

We can gain further insight into Judge Brahos's reasoning process by considering the extraordinary statements by him that pepper the transcript of the hearing, beginning with the extreme displeasure he displayed at the fact that the petitioner testified in a soft voice. He said: "[Y]ou have to speak up so I can hear your voice. Today passiveness and demureness is not the regiment [*sic*] of the day. Today aggressiveness and loudness is [*sic*] the regiment [*sic*] of the day and you can even scream at the Court. I will not take offense to that, but I want to hear your voice. So, if you force me repeatedly to ask you to raise your voice I will not be pleased. And also might indicate the posture of your case as well. If you're really strong in your convictions you'll express it in a strong manner. If your answers are weak the Court may believe that you're [*sic*] claim is also weak so conduct yourself accordingly." I have never before heard it suggested that truthfulness can be inferred from a witness's decibel level. Nor have I ever heard of a judicial officer's inviting a witness to scream at him. What makes Judge Brahos's tirade weirder still is that the petitioner was testifying in French (the official language of Togo), not English, and the interpreter did not complain that he couldn't hear her. So even if she'd been completely inaudible to the judge, it could have made no rational difference to him.

The fact that she was testifying through an interpreter has a significance that my colleagues do not appreciate

when they say that "The IJ spent 6 hours in a hearing room, face to face, with Ms. Apouviepseakoda. We have never met her." I take this to be an allusion to the common though not necessarily correct belief that being present when a witness testifies greatly assists a judge or juror in determining whether the witness is telling the truth. Even if so in general, it cannot be so when the witness is a foreigner testifying through an interpreter, especially if the judge cannot even hear the foreigner, but only the interpreter. Reading the facial expressions or body language of a foreigner for signs of lying is not a skill that either we or Judge Brahos possess.

The judge was skeptical about the petitioner's claim that her husband owned a radio station in Togo. She tendered a photo, but he responded that "I have photographs also in high school where I took pictures with a radio transmitter there. Does that mean that that is an operating business because you have a photograph?" He also asked her whether the record contained anything "from the listeners to verify that they heard the station." He was also skeptical about her testimony that her husband owned a garbage-collection business. He was troubled that she "has no specific items from employees who verified that they worked for your husband"—does Judge Brahos really expect garbage men in Togo to provide affidavits concerning their former employer, now an enemy of the state? The judge thought it remarkable that the petitioner did not remember the years in which her husband owned the garbage-collection business, saying: "A spouse does not know what her husband is doing when he's working, is that what you wish me to believe, ma'am?" To which she sensibly answered: "Yes. In Africa it is very difficult for a woman to be involved in her husband's business." He persisted: "So, when he goes to work in the morning you don't know where he's going, is that what you're saying? [It's not what she had testified.] He doesn't

tell you [?]" She answered: "He tells me that he goes to work but I don't follow him to see where he, he's would go." To which Judge Brahos responded: "That's amazing." He then instructed the interpreter: "You want to tell her that's amazing. You want to tell her."

Enough about Judge Brahos's appalling handling of this serious case. The failure is more an institutional than a personal one. One cannot but sympathize with the difficulty under which the immigration judges labor quite apart from their horrendous workloads, which Congress and the Justice Department have done nothing to try to alleviate. Rarely, at least in the cases that reach this court, have the parties presented to the Immigration Court evidence of high probative value either for or against the claim for asylum. Most asylum applicants come from distant, poor, and poorly governed countries about which Americans, including the immigration judges, who are not selected for their knowledge of foreign countries, know nothing—countries in which often it is impossible to find witnesses or obtain accurate documentary evidence supporting or opposing the applicant's case. Rarely is there much evidence beyond the applicant's testimony. She has the burden of proof, and the immigration judge is not required to accept her testimony just because it is not refuted. He should not. He should probe for contradictions, and if he finds serious ones he can refuse to believe her testimony and we will uphold his ruling. What he cannot be permitted to do is ignore the rules of logic, as Judge Brahos did in this case when he declared that to be seen by a doctor in "consultation" both is and is not to be "treated" by the doctor; or to fabricate contradictions, as he did when he concluded that the hospital photographs had been taken in 2003, though they could not have been taken then since, so far as appears, they had been submitted to the immigration authorities in 2002; or to assume, as the judge did throughout his

opinion, that a West African dictatorship is in all material respects just like the United States. The immigration judge's opinion is pervaded by gross errors of fact and logic, and read in light of the hearing transcript is an embarrassment to American justice.

It may be true, as the majority opinion suggests in footnote 2, that the conditions under which the immigration judges labor are such that these judges cannot be expected to make "competent findings of fact." But the majority is wrong to think that therefore a reviewing court should uphold immigration judges' incompetent findings of fact. For then an agency could insulate its decisions from judicial review simply by understaffing.

The petitioner is entitled to a new hearing before a different immigration judge.

A true Copy:

       Teste:

                               _____
                               *Clerk of the United States Court of*
                                   *Appeals for the Seventh Circuit*