In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3307

JONATHAN CASTILHO DE OLIVEIRA,

*Petitioner,*

*v.*

ERIC H. HOLDER JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A97-336-968

ARGUED JUNE 5, 2008—DECIDED MAY 8, 2009

Before POSNER, KANNE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Jonathan Castilho de Oliveira, a
citizen of Brazil, sought asylum and withholding of
removal, claiming that Brazilian governmental and bank-
ing officials were involved in the assassination of his
father and are now intent on taking his life. An Immigra-
tion Judge ("IJ") disbelieved Castilho de Oliveira's story
and also held in the alternative that even if it were true,
it did not establish eligibility for asylum. The Board of

Immigration Appeals ("BIA") adopted and affirmed that decision, and Castilho de Oliveira petitioned this court for review.

Without commenting on the merits of Castilho de Oliveira's claim, we conclude that he did not receive a fair hearing before a neutral immigration judge. The IJ repeatedly interrupted the testimony to ask irrelevant and sometimes inflammatory questions, refused to consider important evidence, and decided the case without seriously engaging with the evidence in the record. Indeed, so troubling are some of these lapses that we are left with the impression that the IJ "cared little about the evidence and instead applied whatever rationale he could muster to justify a predetermined outcome." *See Bosede v. Mukasey*, 512 F.3d 946, 952 (7th Cir. 2008). Accordingly, we grant Castilho de Oliveira's petition for review, vacate the decision of the BIA, and remand for a new hearing.

## I. Background

Jonathan Castilho de Oliveira, a 20-year-old native of Brazil, sought asylum and withholding of removal after entering the United States illegally through Mexico. At his asylum hearing, he testified that corrupt governmental and banking officials in Brazil were conspiring to kill him because of his family ties, that the government of Brazil was unwilling or unable to protect him, and that he would be killed if he returned to Brazil.

At the center of Castilho de Oliveira's claim is an illegal banking scheme organized to fund the campaigns of two

corrupt politicians. Castilho de Oliveira's father, a participant in the scheme, was murdered when Castilho de Oliveira was only eight years old. The apparent motive for the killing was that his father had threatened to expose the scheme. He was found dead in his car, shot in the head; the car was riddled with bullets, ganglandstyle. Castilho de Oliveira's family believes that the politicians and banking officials involved in the scheme ordered the hit to avoid the scandal and accountability that might have flowed from exposure of their involvement in public corruption.

Castilho de Oliveira's mother turned over incriminating documents and audiotapes to a local prosecutor, who began an investigation, but because the scheme involved important political figures and bankers, local law-enforcement officials dragged their feet.[1] So Castilho de Oliveira's mother began to campaign for justice for her murdered husband. Her activities enraged her husband's former accomplices and led to death threats against the family. These threats form the basis of Castilho de Oliveira's asylum and withholding claims.

Castilho de Oliveira testified that the harassment of his family began with threatening phone calls but escalated

---

[1] Castilho de Oliveira testified that the hitman who actually shot and killed his father was convicted and sentenced to a lengthy prison term but served only two years. Accomplices—the high-level banking and political officials involved in the banking scheme (and also, according to Castilho de Oliveira and his family, the murder)—continue to escape responsibility.

into more ominous conduct. According to an affidavit submitted by Castilho de Oliveira's mother, she began to notice strange men following her family everywhere, sometimes pointing guns at her and Castilho de Oliveira, and in one incident approaching the family's home and knocking on the door. The family went into hiding, moving frequently. Castilho de Oliveira testified that because of the threats he was, for much of his childhood, unable to go outside to play. Although he attended school, he switched schools frequently to prevent his location from being discovered. The threats eventually diminished, and Castilho de Oliveira and his family moved back to the town where his father had been murdered. There, they were temporarily able to live a more normal life. Eventually, though, the threats began anew, and Castilho de Oliveira's mother decided to take her children to the United States.

The United States was not as welcoming as she had hoped. Castilho de Oliveira's mother and sister were only able to obtain tourist visas, and Castilho de Oliveira's application for a visa was denied altogether. His mother decided to flee anyway, bringing her daughter to this country (where they now apparently live on expired visas), leaving Castilho de Oliveira in Brazil in the care of an aunt. A cousin resumed the family's quest for an investigation into Castilho de Oliveira's father's murder.

About two years after his mother and sister left, Castilho de Oliveira again began to receive death threats from one of the men involved in his father's assassination. Castilho de Oliveira testified that he initially encountered

this man in an ice-cream store; the man repeatedly de-manded to know where Castilho de Oliveira lived, where his mother was, and where he went to school. Castilho de Oliveira gave evasive responses, but the next day the man phoned his aunt's house, warning that Castilho de Oliveira's fate would be the same as his father's. Fearing that his life was in danger, Castilho de Oliveira fled to the United States via Mexico but was detained at the border.[2] He then sought asylum and withholding of removal.

The claims were heard by Immigration Judge O. John Brahos, who rejected Castilho de Oliveira's account as not credible. In the alternative, the IJ held that even if Castilho de Oliveira's story was true, it wasn't sufficient to meet the requirements for asylum. The BIA agreed, and because it adopted and affirmed the IJ's decision, adding essentially no analysis of its own, we review the IJ's decision directly. *Niam v. Ashcroft*, 354 F.3d 652, 655-56 (7th Cir. 2004).

## II. Analysis

Castilho de Oliveira challenges all aspects of the IJ's decision, arguing that the adverse credibility finding was not sufficiently grounded in the record evidence and attacking the alternative ruling—that Castilho de Oliveira's story was in any event insufficient to establish eligibility

---

[2] Castilho de Oliveira also has an older half-sister, who came to the United States from Brazil on her own after he arrived.

for asylum—as similarly unsupported by the record. In addition, Castilho de Oliveira takes aim at the IJ's conduct during the hearing, arguing that the judge's behavior reflected bias or a predetermination to reject his claim.

## A.  The Adverse Credibility Determination

We begin with the IJ's credibility finding, which is ordinarily entitled to a high level of deference. *See Apouviepseakoda v. Gonzales*, 475 F.3d 881, 888 (7th Cir. 2007). Here, however, we do not defer to the IJ's credibility determination because it is unsupported by the evidence in the record. *See Oforji v. Ashcroft*, 354 F.3d 609, 613 (7th Cir. 2003). The IJ found Castilho de Oliveira's claim to be implausible, but his explanation suggests that he strained to find difficulties with Castilho de Oliveira's testimony while ignoring evidence that corroborated it.

The IJ first doubted Castilho de Oliveira's claim that prosecutors in Brazil maintained an open investigation of his father's assassination, finding it unlikely that such an investigation could still be ongoing more than ten years after a murder. But his skepticism was based on speculation rather than anything in the record. He ignored Castilho de Oliveira's plausible-sounding explanation for the delay—that prosecutors had deliberately dragged their feet in order to protect high-level officials. The IJ also ignored a State Department report Castilho de Oliveira submitted in support of his claim; that report concluded that justice in Brazil moves slowly

and that corrupt justice officials often engage in dilatory tactics to protect politically favored criminals.[3] To give only two examples, the report noted that the average case involving corrupt police officers takes eight years to reach a decision and specifically mentioned a case involving 85 police officers who are still awaiting trial for a 1992 prison massacre. *Id.*

Instead of addressing this corroborating evidence regarding conditions in Brazil, the IJ reasoned by supposed analogy to prosecutorial practices in the United States, concluding that prosecutors in Brazil must expeditiously pursue all reported allegations of wrongdoing and therefore the existence of an open investigation was implausible. The analogy to prosecutorial norms in the United States was odd; there was no evidence to support it. To the contrary, the record evidence suggested that the Brazilian justice system suffered from corruption and politically motivated delay. According to the State Department report in the record, "[j]ustice remained slow and unreliable" in Brazil, and in certain cases "local police often were less diligent in investigating, prosecutors were reluctant to initiate proceedings, and judges found reasons to delay." *Id.*

There were a number of other problems with the IJ's credibility determination. The judge doubted Castilho de Oliveira's account of having been threatened by one

---

[3] BUREAU OF DEMOCRACY, HUMAN RIGHTS & LABOR, U.S. DEP'T OF STATE, BRAZIL: COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES–2004 (Feb. 28, 2005).

of the men involved in his father's murder, concluding that if Castilho de Oliveira actually had been intimidated, he would have reported the incident to police. This ignored the evidence that the family's prior reports to police had been fruitless—which would plausibly explain why a frightened teenager would not report a threat to police—and that Castilho de Oliveira's aunt had reported the incident to the police on his behalf.

The IJ also discredited Castilho de Oliveira's testimony as insufficiently corroborated because his mother and sister had not testified on his behalf. Castilho de Oliveira's mother did submit a lengthy affidavit, which the IJ ignored. Instead, the judge speculated that his mother and sister had declined to testify in person because their stories could not withstand cross-examination. The IJ did not consider an equally plausible explanation for their absence—that Castilho de Oliveira's mother and sister, both of whom are apparently in this country illegally, refrained from appearing to avoid detention based on their status.

The IJ's apparent determination to make an adverse credibility finding also manifested itself in an outright refusal to consider relevant documentary evidence. Castilho de Oliveira tried to submit numerous newspaper articles—many of them originals—corroborating the details of his father's murder. The IJ refused to consider the articles because they had not come directly from the newspaper's "morgue" and did not bear any form of authentication from the newspaper's publisher. There is no justification for such a requirement. Under

the *Federal Rules of Evidence,* documents purporting to be newspaper articles are self-authenticating, *see* FED. R. EVID. 902(6), and in immigration proceedings—where the rules of evidence do not apply—evidentiary standards are generally more lax. Absent evidence of forgery, alteration, or some other reason to doubt their authenticity, the IJ was not entitled to completely disregard the newspaper articles. *Cf. Shtaro v. Gonzales*, 435 F.3d 711, 717 (7th Cir. 2006) (lack of authentication is not evidence of forgery).

On the flip side, while refusing to consider this relevant corroborating evidence, the IJ unjustifiably faulted Castilho de Oliveira for failing to present other types of corroboration the IJ thought he ought to have obtained—evidence that would have been marginally relevant at best. In the place of the newspaper articles, for example, the IJ demanded a letter or affidavit from Castilho de Oliveira's priest to corroborate his testimony, reasoning that because Castilho de Oliveira was Catholic, his priest would know whether his claims were true. But Castilho de Oliveira's asylum claim had nothing to do with religion. Requiring this sort of corroboration was bizarre, to say the least, in the context of this case.

In any event, in response to this line of questioning from the IJ, Castilho de Oliveira testified that he and his family did not attend church regularly. Disregarding this testimony, the IJ inexplicably rested his adverse credibility determination in part on Castilho de Oliveira's failure to obtain a letter of support from his priest. In short, the

IJ's stated reasons for disbelieving Castilho de Oliveira's story were either speculative or irrelevant, while material favorable evidence was left unaddressed.

**B.   Eligibility for Asylum**

The IJ's alternative holding suffers from similar problems. The IJ held that even accepting Castilho de Oliveira's story as true, "harassment of this nature" does not rise to the level of past persecution or "establish[] future persecution under these facts." To qualify for asylum, Castilho de Oliveira needed to demonstrate either that he had suffered past persecution or that he reasonably feared future persecution on a statutorily protected ground. *See BinRashed v. Gonzales*, 502 F.3d 666, 670 (7th Cir. 2007) (discussing persecution claims based on membership in a family group). The IJ's refusal to find past persecution on this record is probably sustainable; threats of the type Castilho de Oliveira described usually aren't enough, without more, to qualify as past persecution. *Boykov v. INS*, 109 F.3d 413, 416-17 (7th Cir. 1997). But the IJ's explanation for concluding that Castilho de Oliveira did not reasonably fear future persecution is more problematic.

The IJ's first reason for rejecting Castilho de Oliveira's future persecution claim was that Castilho de Oliveira posed no real threat to any political figures in Brazil. The IJ reasoned that unless Castilho de Oliveira had evidence to implicate the accomplices in his father's murder at a future trial, there would be no reason for anyone to want to harm him. This misconstrues Castilho de

Oliveira's argument. He testified that political and banking officials wanted him dead because his mother and cousin had pressured prosecutors to investigate the link between his father's murder and government corruption. The goal was not to prevent Castilho de Oliveira from giving evidence (he was, after all, only eight years old when his father was murdered); it was, instead, to intimidate his family into silence. Castilho de Oliveira also presented the testimony of Frutuoso Santana, a graduate student at the University of Chicago, as an expert witness on Brazilian society. Santana testified that in Brazilian culture Castilho de Oliveira would be perceived as a threat because of his status as the only male child of a murdered father. Castilho de Oliveira's claim thus was not that he feared persecution based on his ability to give evidence against those who were complicit in his father's murder. Rather, his claim was that he would be the target of retaliation against his family.

The IJ also questioned Castilho de Oliveira's fear of future persecution because his cousin had been able to remain, without incident, in Brazil. The IJ thought that because the cousin—who continued to pressure prosecutors to pursue the investigation—had not been the victim of any threats, Castilho de Oliveira would also be safe. But this reason lacks any basis in the record. There was no evidence one way or the other about whether Castilho de Oliveira's cousin had been threatened.

Some of the IJ's other reasons for rejecting Castilho de Oliveira's claim were more plausible but not fully developed. The IJ noted, for example, that Castilho

de Oliveira had lived in Brazil unharmed for eight years following his father's murder and that his mother no longer lived there, both of which reduced the risk that he would be the target of attack if he returned. These are legitimate potential problems with Castilho de Oliveira's claim and may ultimately mean that he is ineligible for asylum. That Castilho de Oliveira lived in Brazil unharmed for eight years suggests that the threats against him were not as serious as they might otherwise seem. And because his mother is no longer in the country, she is presumably unable to continue agitating for an investigation into government corruption associated with her husband's murder. But the IJ didn't grapple with other evidence that suggested the opposite conclusion—that Castilho de Oliveira had spent at least some of his time in Brazil in hiding and that he might still be perceived as a target for retaliation in Brazilian culture because he is the only son of a murdered father. Castilho de Oliveira's expert witness bolstered this interpretation of the evidence. Without at least some discussion of this more favorable evidence, and in light of the other flaws in reasoning we have identified, the IJ's analysis of the merits of Castilho de Oliveira's claim was not adequately grounded in the record.

## C.  The IJ's Irrelevant and Inflammatory Questions

Castilho de Oliveira finally challenges aspects of the IJ's behavior during the hearing, arguing, for example, that the judge repeatedly and inappropriately interrupted his testimony and that of his expert with irrelevant and

confrontational questions. An IJ's cross-examination of witnesses is not alone cause for concern; under the applicable statutes, immigration judges are authorized to "interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1); *see also Apouviepseakoda*, 475 F.3d at 885. But the IJ's frequent interruptions in this case were highly problematic. Judge Brahos repeatedly stopped both Castilho de Oliveira and his expert witness to ask irrelevant—and in some cases entirely inappropriate—questions. For example, the IJ demanded to know the witnesses' religious beliefs—and pursued this line of questioning at some length with each witness—even though Castilho de Oliveira's claims were not based on religious persecution. The IJ questioned Castilho de Oliveira about whether his half-sister was "born out of wedlock," an utterly irrelevant inquiry. The IJ derailed the expert's testimony to discuss the totally inappropriate and irrelevant topic of whether Castilho de Oliveira might be infertile—or, as the judge indelicately put it, whether Castilho de Oliveira might "shoot blanks."

Comments and questions of this nature are wholly inappropriate, if not enough alone to warrant a new hearing. While these improper questions did not ultimately have the effect of preventing Castilho de Oliveira from putting on his case, *see Apouviepseakoda*, 475 F.3d at 885-86, they are worth discussing because they suggest a larger problem of apparent bias on the part of the IJ.

Taken individually, any of the flaws we have identified in this hearing might be viewed as a harmless mistake.

But the record as a whole—the tone of the IJ's cross-examination of Castilho de Oliveira and his expert witness, the frequent interruptions, the inappropriate questions and comments, and the IJ's ultimate failure to engage with the evidence in the record while resting his decision on speculation and irrelevancies—leaves the impression that the IJ entered the hearing with his mind already made up.

The problems we have identified are cumulatively disturbing and convince us that Castilho de Oliveira was denied a meaningful opportunity to be heard before a neutral IJ, required by statute and regulation.[4] *See* 8 U.S.C. § 1229a(b)(4)(B); 8 C.F.R. § 1240.1(c); *Bosede,* 512 F.3d at 952. Accordingly, Castilho de Oliveira's petition for review is GRANTED; the decision of the BIA is VACATED; and the case is REMANDED for a new hearing, preferably before a new immigration judge.

---

[4] We have previously called into question similar behavior by Judge Brahos in other cases: "factual error, bootless speculation, and errors of logic," *Pramatarov v. Gonzales,* 454 F.3d 764, 765-66 (7th Cir. 2006); questioning "so harsh and rude as to suggest bias," *id.*; and conduct that was "unseemly," "intempera[te]," and even "mocking," *Apouviepseakoda*, 475 F.3d at 886. That it continues is inexplicable.