# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-1465 & 09-3526

CECILIO GUTIERREZ-BERDIN,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petitions for Review of Orders of
the Board of Immigration Appeals.
No. A099-025-599

ARGUED MAY 25, 2010—DECIDED AUGUST 19, 2010

Before FLAUM, ROVNER, and WOOD, *Circuit Judges.*

FLAUM, *Circuit Judge.* Petitioner is an alien who has
been apprehended by agents of Immigration and
Customs Enforcement ("ICE") for illegal entry into the
United States and placed in removal proceedings. He
seeks to characterize certain aspects of these pro-
ceedings as constitutional defects that deprive him of
his right to due process of law. We deny in part and
dismiss in part his petition for review.

### I. Background

On May 22, 2006, ICE agents arrested petitioner Cecilio Gutierrez-Berdin at his parents' home in Aurora, Illinois, and served him with a Notice to Appear ("NTA") in Immigration Court to commence removal proceedings. The NTA charged that petitioner was removable under 8 U.S.C. § 1182(a)(6)(A)(i) because he was an alien present in the United States without being admitted or paroled. The NTA bore the heading "U.S. Department of Justice, Immigration and Naturalization Service." It was signed by Robin Buckley as the issuing officer in Chicago, Illinois. The NTA ordered the recipient to appear before an Immigration Judge at a time and date to be set in the future.

Following the arrest, ICE agents filled out a U.S. Department of Justice Record of Deportable/Inadmissible Alien, known as Form I-213, which explained that appellant, an associate member of the Aurora faction of the Surenos 13 gang, was rounded up as part of Operation Dismantle. Form I-213 further specified that Gutierrez-Berdin, a native and citizen of Mexico, entered the United States on foot on February 1, 1998, twenty miles west of El Paso, Texas. He had previously been apprehended on the border and voluntarily removed to Mexico on January 11, 1998. Form I-213 also stated that after agents arrested Gutierrez-Berdin at midnight on May 22, 2006, he resisted arrest and "was hostile and uncooperative with all officers . . . regarding the whereabout of" his uncle, Jose Verdin.

Petitioner requested a bond hearing before an Immigration Judge ("IJ"). As part of its response, on June 12,

2006, the government submitted a copy of the NTA to Immigration Judge George Katsivalas. Gutierrez-Berdin submitted his high school diploma and transcript; a picture of himself in a cap and gown; a letter from the pastor of Saint Nicholas Catholic Church stating that Gutierrez-Berdin attends mass every Sunday with his parents; a Certificate of Achievement dated October 20, 1999; and a certificate for completion of middle school at Simmons Middle School, dated June 7, 1999.

The IJ ordered Gutierrez-Berdin released upon posting an $8,000 bond. Per petitioner's request, IJ Katsivalas also continued the case for additional attorney preparation. On November 17, 2006, Gutierrez-Berdin appeared before Immigration Judge O. John Brahos, represented by his current counsel. Petitioner advised the court that he would not be admitting any of the allegations against him and moved to suppress and exclude Form I-213, the NTA, and their contents on the ground that the government procured the evidence in violation of Gutierrez-Berdin's Fourth and Fifth Amendment rights. Along with the motion, petitioner presented an affidavit where he swore that ICE agents lacked a warrant for his arrest. Petitioner also stated that during the arrest, the agents "mistreated me. They yelled at me and handcuffed my hands behind my back, and lifted them up, and pushed me out the door, it felt like my arms were going to break. I was very afraid. They had guns. They did not advise me of my rights." The affidavit went on to state:

> 3. When they [the ICE agents] took me to Broadview [Staging Area and Detention Center], two officers demanded that I sign some papers, but I refused. A

man yelled at me and said "Sign the fucking papers. You don't have any rights." A woman yelled at me, and also swore at me and told me to sign the papers.

4. I was not charged with committing a crime.

5. I have never been arrested before the arrest I have described.

6. I am married to a United States citizen, and I am the father of a United States citizen child. I believe that my rights were violated. I was treated like an animal.

On petitioner's motion, the IJ continued the case and held a substantive hearing on April 19, 2007. The government planned to present only the NTA, Form I-213, and testimony by Gutierrez-Berdin to make their case, but petitioner moved to suppress the form on the grounds that it was filed in violation of local timing rules and was procured through unconstitutional means. Immigration Judge Brahos denied petitioner's motion to suppress, explaining that even if taken at face value, Gutierrez-Berdin's self-serving affidavit "fails to describe misconduct egregious enough to justify suppression." The IJ then went to find petitioner, who refused to answer any questions for fear of self-incrimination, a removable alien on the basis of the combination of a negative inference drawn from his silence with the uncontroverted contents of the presumptively reliable Form I-213.[1] Brahos deter-

---

[1] In a subsequent written order, dated May 3, 2007, IJ Brahos summarized the form as stating that

(continued...)

mined that the level of detail in the I-213 permitted the inference that Gutierrez-Berdin himself provided the information relating to his alienage, and that petitioner did not present enough evidence to show that the government obtained the information in the I-213 through coercion or duress.

The IJ then dismissed as meritless Gutierrez-Berdin's objection that the form bears the heading of INS, which no longer exists, explaining that in 6 U.S.C. §§ 552(d) and 557, the statute transferring INS removal functions to the Department of Homeland Security ("DHS") specifically provided that any reference to INS in regulations and delegations of authority should be read to mean DHS. Finally, although the IJ drew an adverse inference from Gutierrez-Berdin's refusal to testify, he acknowledged that silence alone is not sufficient to establish a prima facie case of removability under *Matter of Guevara*, 20 I. & N. Dec. 238 (1991).

---

[1] (...continued)

> the respondent is a native and citizen of Mexico; he was first apprehended by Border Patrol agents on January 11, 1988 and was voluntarily removed to Mexico; he re-entered the United States at or near El Paso, Texas on or about Feb. 1, 1998 without inspection; he was arrested at his residence by ICE agents on May 22, 2006; and at that time, he admitted that he was present in the United States illegally and lacked any "immigration papers."

Petitioner was three years old in 1988, but the IJ's reference to that year was a simple typographical error that does not affect the outcome of this case.

Finding that the government satisfied its burden of proof, the IJ then considered whether respondent could show that he was in the United States lawfully. Since Gutierrez-Berdin stayed silent and his affidavit said nothing about lawful admission, IJ Brahos found him removable as charged. He then went on to deny petitioner's request for voluntary departure.

Petitioner filed a timely appeal from the order to the Board of Immigration Appeals ("BIA"). He requested that a three-member panel rule on the issues, but on February 6, 2009, the BIA issued a one-member decision wholly adopting and affirming the IJ's decision. It denied Gutierrez-Berdin's request for three-member review because petitioner's arguments did not fall into any of the categories entitled to such a procedure under 8 C.F.R. § 1003.1(e)(6). The BIA found no evidence of bias or partiality in the IJ, concluded that he did not abuse his discretion in denying voluntary departure, and rejected petitioner's attempts to portray the NTA as defective. Finally, the BIA held that removal to Mexico did not amount to cruel and unusual punishment prohibited by the Eighth Amendment. Subsequently, the BIA denied Gutierrez-Berdin's timely motions to reconsider and reopen the matter. He now appeals from both orders.

## II. Discussion

Where, as here, the Board of Immigration Appeals adopts the decision of the Immigration Judge as a whole, we review the original IJ decision. *Rodriguez Galicia v. Gonzales*, 422 F.3d 529, 535-36 (7th Cir. 2005). This case

implicates four separate standards of review. First, we scrutinize de novo the IJ's determination that admission of Form I-213 did not violate petitioner's due process rights because it is a question of law. *Boci v. Gonzales*, 473 F.3d 762, 768 (7th Cir. 2007). Second, we give great deference to the IJ's factual findings, deeming them "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary . . . ." 8 U.S.C. § 1252(b)(4)(B); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). That is, we reverse the agency's decision "only if the record compels a different result, and not simply because we are convinced that we would have decided the case differently." *Hassan v. Holder*, 571 F.3d 631, 641 (7th Cir. 2009). Third, we review the Board's denial of a motion to reopen or reconsider for abuse of discretion. *Kebe v. Gonzales*, 473 F.3d 855, 857 (7th Cir. 2007). In doing so, we take into account the "strong public interest in bringing litigation to a close," *INS v. Abudu*, 485 U.S. 94, 107 (1988), and thus disfavor reopening. *See Selimi v. Ashcroft*, 360 F.3d 736, 739 (7th Cir. 2004). Accordingly, we uphold the decision of the BIA unless it was "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Awad v. Ashcroft*, 328 F.3d 336, 341 (7th Cir. 2003). Finally, we lack jurisdiction to review discretionary decisions by the Department of Justice with respect to requests for voluntary departure. *See* 8 U.S.C. § 1229c(f); *Sofinet v. INS*, 196 F.3d 742, 748 (7th Cir. 1999).

Petitioner sets forth a litany of complains about the IJ's decision, but these can be condensed into four main contentions: that the IJ erred in denying petitioner's motion to suppress Form I-213; that the government did not adequately prove petitioner's alienage; that some aspect of petitioner's arrest and subsequent deportation hearings violated his right to due process of law; and that the BIA's denial of petitioner's motion to reopen violated his "right to due process as well as his right to equal protection." The rest of his arguments are either redundant or not properly presented in this appeal.

A.  Motion to Suppress

The IJ did not err in denying Gutierrez-Berdin's motion to suppress Form I-213. Since the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," but does not specify an enforcement mechanism for its violations, the Supreme Court has articulated the so-called exclusionary rule. Said rule, "when applicable, forbids the use of improperly obtained evidence at trial" and seeks "to safeguard Fourth Amendment rights generally through its deterrent effect." *Herring v. United States*, 129 S. Ct. 695, 699 (2009) (citations omitted). Exclusion is a relatively narrow remedy, however. It "is used in only a subset of all constitutional violations—and excessive force in making an arrest or seizure is not a basis for the exclusion of evidence." *Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010).

More importantly, removal proceedings are civil, not criminal, and the exclusionary rule does not generally apply to them. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050-51 (1984); *Krasilych v. Holder*, 583 F.3d 962, 967 (7th Cir. 2009). In *Lopez-Mendoza*, the Supreme Court left open the possibility that the exclusionary rule may apply where there have been "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." 468 U.S. at 1050-51; *see also Martinez-Camargo v. INS*, 282 F.3d 487, 492 (7th Cir. 2002). Gutierrez-Berdin's claims do not reach this level. Even taken at face value, petitioner's self-serving affidavit alleges what can best be characterized as very minor physical abuse coupled with aggressive questioning. Questions and verbal demands that a person sign documents are not themselves searches and seizures that could violate the Fourth Amendment, *Muehler v. Mena*, 544 U.S. 93, 101 (2005); *Martinez-Camargo*, 282 F.3d at 493; *United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) (en banc). This observation is especially true here, where such entreaties proved unsuccessful because petitioner refused to comply. As for potential physical misconduct, handcuffing an alien who resisted arrest is certainly not the "egregious" behavior contemplated by *Lopez-Mendoza*.

Form I-213 is a presumptively reliable administrative document. Since petitioner did not demonstrate any inaccuracy in its contents, the IJ acted appropriately in considering it as evidence of alienage. *See Barradas v. Holder*, 582 F.3d 754, 763 (7th Cir. 2009) ("Absent any

indication that a Form I-213 contains information that is manifestly incorrect or was obtained by duress, the BIA has found the Form to be inherently trustworthy and admissible as evidence. We have agreed with that position.") (citing *In re Ponce-Hernandez*, 22 I. & N. Dec. 784, 785 (B.I.A. 1999)); *Rosendo-Ramirez v. INS*, 32 F.3d 1085, 1089 (7th Cir. 1994).

Gutierrez-Berdin also argues that he was arrested without a warrant, but the record does not support this contention. Petitioner then claims that the NTA and accompanying warrant were issued by the now-defunct Immigration and Naturalization Service ("INS"), which was part of the Department of Justice, and thus could not authorize action by ICE agents, who fall under the umbrella of the Department of Homeland Security and actually carried out the arrest. The IJ correctly found this assertion to be vacuous based on both explicit statutory transfer of authority from the INS to the DHS, 6 U.S.C. §§ 552, 557, and our own caselaw. *Sosnovskaia v. Gonzales*, 421 F.3d 589, 591 n.2 (7th Cir. 2005); *Diallo v. Ashcroft*, 381 F.3d 687, 690 n.1 (7th Cir. 2004). In any event, warrantless arrests of suspected illegal aliens are permissible in some situations, *see* 8 C.F.R. § 287.3 (2010), and there is no evidence that the government violated procedures associated with such an arrest in a way prejudicial to the petitioner in this case. *See Martinez-Camargo*, 282 F.3d at 492 ("[T]he Supreme Court has held that where an administrative regulatory violation does not adversely affect a petitioner's substantive rights an exclusionary remedy is not available."). The fact that the NTA left the time and date

of a deportation hearing to be determined at a future date did not render it defective because subsequent documents set out the requisite information. *Dababneh v. Gonzales*, 471 F.3d 806, 809 (7th Cir. 2006).

Finally, to the extent that Gutierrez-Berdin's affidavit could be read to mean that ICE agents did not adequately notify him of his rights, such an error would not make otherwise voluntary statements inadmissible. *See Lopez-Mendoza*, 468 U.S. at 1039. There is no evidence of coercion in the record or the motion to suppress, so the IJ did not offend the constitution by admitting Form I-213 into evidence. Appellant concludes by arguing that the IJ erred in admitting the form because it was part of the record during the bond hearing, but the relevant regulations do not prevent the IJ from considering the same pieces of evidence during both stages of adjudication. A breach of the applicable procedures would be harmless here anyway, because petitioner's counsel had months to review the 2-page Form I-213.

B.  Due Process Right to a Hearing

Gutierrez-Berdin next argues that IJ Brahos demonstrated bias and irreverence of a degree sufficient to deprive him of due process guaranteed by the Fifth Amendment. *See Plyer v. Doe*, 457 U.S. 202 (1982). We have long held that "if an applicant in an immigration court has not received a meaningful opportunity to be heard, she has been denied due process, and we must grant her petition and remand for further proceedings." *Floroiu v. Gonzales*, 481 F.3d 970, 974 (7th Cir. 2007).

"To obtain relief, the petitioner must produce some evidence indicating that the denial of due process 'actually had the potential for affecting the outcome' of the proceedings." *Id.*

Petitioner's claim that the IJ was impermissibly partial to the government, essentially amounts to an ad hominem attack on the judge. That is, Gutierrez-Berdin cites two cases where we criticized IJ Brahos for his conduct in immigration proceedings and argues that his behavior in the present case was similarly problematic. Our review of the record shows this contention to be baseless.

Petitioner states that the fact that the IJ overruled all of petitioner's objections demonstrates a disregard for the evidence on behalf of the judge. Petitioner also points to the following "offensive" comment by the IJ as an indicator of his pro-government bias:

> But as a -as you recall, alienage is not suppressible. All right. So we have an alien before the Court and as you recall we—using as a euphemism, not tending at all to insult the respondent [sic]. Once the INS or the Department of Homeland Security, in the stream, locates a alien [sic] and they pick him out of the stream, they don't throw him back into the stream.

Unsurprisingly, Gutierrez-Berdin does not attempt to explain which aspect of the remark he considers to be inappropriate. When the BIA reviewed this argument, it determined that IJ Brahos did not intentionally characterize Gutierrez-Berdin as a fish and that any unintentional connotation was not enough to render the hearing ineffective. We agree.

The two cases where we found the IJ's behavior to be so inappropriate as to violate the Due Process Clause stand in stark contrast to the matter before us today. First, in *Bosede v. Mukasey*, 512 F.3d 946 (7th Cir. 2008), IJ Brahos gave short shrift to arguments made by an HIV-positive petitioner that if he was deported to Nigeria, he would be imprisoned pursuant to a decree requiring all Nigerian citizens convicted of drug crimes abroad to serve five-year sentences ("Decree 33"). Bosede also introduced evidence that the death rate of HIV-positive individuals in Nigerian custody is high because of poor nutrition, bad living conditions, and trivial access to medical care; State Department reports in the record showed that these circumstances have led to the death of at least one HIV-positive person in prison and that all prisoners in Nigeria are severely mistreated. Finally, Bosede testified that when he independently traveled to Nigeria in 2003, the government discovered his infection status, detained him on arrival, and released him only on the condition that he stay in a hotel they specified. Fearing for his life, he ended up bribing an official to get out of the country undetected.

The predicate offenses for Bosede's deportation were two instances of possession of sub-gram quantities of cocaine and one retail-theft conviction for drinking liquor at a grocery store prior to paying for it. Nonetheless, the IJ issued a removal order finding, without elaboration, that Bosede's convictions were "particularly serious crimes" that rendered petitioner, a married father of two, ineligible for cancellation of removal. The IJ then went on to deny petitioner's Convention Against Torture

claim and state that he would order removal even without a statutory bar to contest. The IJ found irrelevant evidence showing that Nigerian prisons were "decrepit" to the point that an HIV-positive prisoner could face the possibility of death and the decree requiring imprisonment would likely lead to Bosede's arrest upon arrival because petitioner did not prove he would "automatically be detained" following deportation. The IJ also relied on Bosede's testimony that he was able to bribe his way out of Nigeria in 2003 to conclude that petitioner may have "other options available to avoid detention."

We reversed, citing the IJ's "cavalier attitude towards" petitioner's claims and failure to adequately explain why he considered the two drug offenses to be particularly serious crimes. We also criticized IJ Brahos for disregarding undisputed evidence that Decree 33 would land petitioner in prison. Finally, we were "appalled that the IJ would rest his decision on the absurd proposition that Bosede could evade imprisonment, mistreatment, and possibly death by approaching his jailers and trying to buy his way out." 512 F.3d at 951. Our shock stemmed from the fact that our prior decisions expressly labeled such logic inappropriate. *See, e.g., Oyekunle v. Gonzales*, 498 F.3d 715, 717 (7th Cir. 2007).

Immigration Judge Brahos's conduct in the administrative phase of *Castilho de Oliveira v. Holder*, 564 F.3d 892 (7th Cir. 2009), also featured substantial shortcomings. There, the IJ considered an asylum application from a 20-year-old Brazilian man whose father was assassinated before he could become a whistle-blower about

a political fundraising scheme. Following his father's murder, Castilho de Oliveira spent most of his childhood in hiding, moving from place to place. A few years later, petitioner's mother and younger sister escaped to the United States on a tourist visa and stayed illegally, leaving Castilho de Oliveira behind in the care of an aunt. As petitioner testified at his removal hearing, however, the men seeking to punish his father's intransigence eventually located his aunt and warned her that Castilho de Oliveira would meet the same fate as his father. At that point, petitioner fled to America and requested asylum.

The IJ denied this relief on the grounds that Castilho de Oliveira's account was not credible. Though petitioner submitted State Department reports that described the Brazilian criminal justice system as dysfunctional and the country's criminal investigators as unwilling to pursue charges against powerful individuals, the IJ found that if petitioner's father was actually murdered for political reasons, prosecutors would have put the perpetrators behind bars. The IJ also determined that because Castilho de Oliveira never reported the threats he received to the police, his testimony was not credible even though petitioner explained that he feared police would do nothing to help and could actually aggravate the situation.

The IJ's ruling in *Castilho de Oliveira* suffered from other serious flaws. For example, IJ Brahos refused to accept copies of newspaper articles about the murder of petitioner's father and the subsequent investigation into

evidence on the grounds that these documents were not properly authenticated. We explained that "[t]here is no justification for such a requirement. Under the Federal Rules of Evidence, documents purporting to be newspaper articles are self-authenticating, and in immigration proceedings—where the rules of evidence do not apply—evidentiary standards are generally more lax. Absent evidence of forgery, alteration, or some other reason to doubt their authenticity, the IJ was not entitled to completely disregard the newspaper articles." 564 F.3d at 897. Finally, we expressed shock at the IJ's behavior during questioning:

> Judge Brahos repeatedly stopped both Castilho de Oliveira and his expert witness to ask irrelevant—and in some cases entirely inappropriate—questions. For example, the IJ demanded to know the witnesses' religious beliefs—and pursued this line of questioning at some length with each witness—even though Castilho de Oliveira's claims were not based on religious persecution. The IJ questioned Castilho de Oliveira about whether his half-sister was "born out of wedlock," an utterly irrelevant inquiry. The IJ derailed the expert's testimony to discuss the totally inappropriate and irrelevant topic of whether Castilho de Oliveira might be infertile—or, as the judge indelicately put it, whether Castilho de Oliveira might "shoot blanks."

564 F.3d at 899.

While we described comments of this nature as "wholly inappropriate," we determined that they "did not ulti-

mately have the effect of preventing Castilho de Oliveira from putting on his case." Rather, they suggested "a larger problem of apparent bias on the part of the IJ," which, combined with "the IJ's ultimate failure to engage with the evidence in the record while resting his decision on speculation and irrelevancies—leaves the impression that the IJ entered the hearing with his mind already made up." *Id.* at 899-900.

By contrast, in the present case, Immigration Judge Brahos conducted an orderly hearing bereft of any legal mistakes. He properly examined evidence and gave due credence to petitioner's points of view. IJ Brahos's metaphor about the flow of illegal immigration into this country does not come anywhere near the conduct that we deemed sufficient to cast doubt on the fairness of the hearing in either *Bosede* or *Castilho de Oliveira*. We thus conclude that the government did not violate petitioner's due process rights.

C.  Proof of Alienage

We have repeatedly held that there is no presumption of innocence in immigration proceedings. *Chavez-Raya v. INS*, 519 F.2d 397 (7th Cir. 1975). Moreover, since the "purpose of deportation is not to punish past transgressions but rather to put an end to a continuing violation of the immigration laws," "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *Lopez-Mendoza*, 468

U.S. at 1039. Accordingly, we have long found permissible negative inferences drawn by immigration judges from a person's refusal to answer questions about their origin during a hearing. *Mireles v. Gonzales*, 433 F.3d 965, 968 (7th Cir. 2006); *see also United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 157 (1923) (holding that there is no "presumption of citizenship comparable to the presumption of innocence in a criminal case. . . . To defeat deportation it is not always enough for the person arrested to stand mute at the hearing and put the Government upon its proof.").

In light of this precedent, the somewhat sparse record before the IJ was nonetheless sufficient for the government to meet its burden of making a prima facie showing of alienage. Form I-213 explains that Gutierrez-Berdin is a citizen of Mexico, establishing foreign origin. Petitioner does not dispute this fact, or argue that any other part of the document is factually wrong. If Gutierrez-Berdin was present in the United States legally, he could have certainly stated as much without being concerned about self-incrimination, so his silence on the matter reasonably should lead to a negative inference. After the government presented evidence of alienage, the burden of proving lawful presence in the U.S. shifted to petitioner. 8 U.S.C. § 1229a(c)(2)(B). Since Gutierrez-Berdin did not provide any evidence of legal status, the IJ appropriately found petitioner to be a removable alien.

D.  Denial of Motion to Reopen and Reconsider

In a last-ditch effort to change the outcome of the appeal, Gutierrez-Berdin contends that the BIA erred when it denied his motion to reopen and reconsider his case. In this respect, we again find his arguments unpersuasive. His claim that the Board's use of "we" in a single-member decision prejudiced him has no merit or support from legal authority. Petitioner's argument that the agency erred by failing to consider Mexico's problem with drug violence fares no better because he did not demonstrate that there was a reasonable possibility or clear probability that he personally would be persecuted on account of a protected characteristic. 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(B); *Pelinkovic v. Ashcroft*, 366 F.3d 532, 539 (7th Cir. 2004) ("We note, as we have many times before, that crisis conditions common to all citizens of the affected country do not present a prima facie case warranting reopening of an asylum claim."). The Board did not abuse its discretion in denying petitioner's motion.

## III.  Conclusion

For the foregoing reasons, we DENY in part and DISMISS in part this petition for review.