NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 9, 2014
Decided July 31, 2014

**Before**

RICHARD A. POSNER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 13-2850

| | |
|---|---|
| MOHAMAD AHMAD EL JABALI, <br> *Petitioner* | Petition for Review of an Order of the <br> Board of Immigration Appeals. |
| *v.* | No. A094-332-499 |
| ERIC H. HOLDER, JR., <br> Attorney General of the United States, <br> *Respondent*. | |

**O R D E R**

Mohamad Ahmad El Jabali, a Lebanese citizen, applied for asylum, withholding of removal, and protection under the Convention Against Torture, which were denied by an immigration judge ("IJ") after making an adverse credibility decision. The Board of Immigration Appeals upheld the denial of relief, and El Jabali moved to reconsider. The BIA denied El Jabali's request, and now he petitions for review of that decision. But El Jabali has not identified any legal or factual error in the BIA's decision, and essentially attacks the credibility finding. Thus, we deny the petition.

El Jabali was admitted to the United States in New York City on December 22, 2000, as a nonimmigrant visitor with permission to remain in the country for six months, *see* 8 U.S.C. § 1101(a)(15)(B). Before he arrived he had been given the contact information for a man who would give him a job in Las Vegas, Nevada. He worked in Las Vegas for about seven to eight months and then moved to Chicago, where he opened a bakery.

The Department of Homeland Security served El Jabali with a Notice to Appear in October 2007, nearly seven years after he entered the country, charging that he exceeded the stay authorized by his visa, 8 U.S.C. § 1227(a)(1)(C)(i). El Jabali first appeared before an IJ in December 2007 and conceded the charge; applied to adjust status through labor certification, *see* 8 U.S.C. § 1255(i) (allowing certain noncitizens to adjust status if physically present in U.S. on December 21, 2000); and indicated that he might apply for asylum. The IJ scheduled El Jabali's next hearing for seven months later, in May 2008, and informed him that he must then apply for any other relief he intended to seek.

At the hearing, the IJ concluded that El Jabali was ineligible to adjust his status and denied that relief. El Jabali's lawyer then told the IJ that El Jabali might be eligible for asylum based on his daughter's recent kidnapping in Lebanon, but counsel added that he had not yet completed an application because El Jabali had learned about the kidnapping only the month before but said nothing to him until the day of the hearing. The IJ reminded counsel that El Jabali had been warned to bring all applications for relief to the present hearing and questioned why the petitioner had not brought this "critically important" event to counsel's attention. Still, the IJ allowed El Jabali to file the asylum application that day.

Later that day, El Jabali applied for asylum, withholding of removal, and protection under CAT based on political opinion. (He also applied on account of religion but later withdrew that ground.) In his application El Jabali explained that he feared returning to Lebanon because his daughter Rabab had been abducted by Hezbollah and taken to El Hermel, near the Syrian border. He added that he, too, had encountered problems with Hezbollah when he lived in Lebanon. In 1989, El Jabali recounted, he was abducted after he refused to take a Hezbollah newspaper from members passing them out. Hezbollah members took him to a Hezbollah-occupied school building, tied his hands behind his back, beat him, and stabbed him in his left shoulder blade. He lived in fear after this incident, El Jabali explained, and left Lebanon from 1992 until 2000, when he came to the United States. El Jabali stated that he did not

immediately apply for asylum when he arrived because he thought he would be able to work and obtain permanent residency, but after his daughter was kidnapped and the IJ denied his application for adjustment, he feared returning.

El Jabali's application sat for four years. At his March 2012 removal hearing, he asserted that his daughter's kidnapping—which he believes was intended to target him—constituted a changed circumstance and supported his eligibility for asylum. He argued that Hezbollah would view him as a traitor because he had been living in the United States and feared the group would kill him based on an imputed westernized political opinion. He testified, though, that he began fearing Hezbollah around 1983, when members began randomly approaching him. He described an occasion in the summer of 1984, where he was stopped in front of a palace and chastised because his sisters did not cover their heads. After this and other incidents (he said there were others but did not provide details), he spoke out against Hezbollah, calling its members extremists. El Jabali also elaborated on his claim that he was kidnapped in 1989. He said that he was stopped at a Hezbollah roadblock by members selling newspapers but did not buy one because he did not support the group. He was stopped at another Hezbollah roadblock down the road, removed from his car, stuffed in the trunk of another car, and taken to the school where he was beaten and stabbed. The kidnappers identified themselves as Hezbollah and told El Jabali that they wanted to teach him a lesson. Four hours later the kidnappers dumped him on the side of the road and warned that next time they would make sure he "won't have a chance."

El Jabali testified that three years later, in 1992, he left Lebanon for Kuwait, where he stayed for a year. But contrary to what he said in his asylum application, which states that he was absent from Lebanon continuously from 1992 through 2000, El Jabali now said that he was back in Lebanon by 1994, left for Egypt in 1995, and then returned to Lebanon in 1996, where he remained until he departed for Liberia en route to America in 2000. El Jabali insisted that his testimony was accurate and that he was confused when completing the application because, during the years that he spent in Lebanon, he would travel to other regions to work for months at a time. He later testified that he traveled so frequently because he feared Hezbollah, although he admitted that he did not encounter any problem with the group between 1996 and 2000.

After he landed in America, El Jabali testified, two of his children were harmed at the hands of Hezbollah. First, about seven months after he arrived, his son was beaten by Hezbollah members seeking information on El Jabali's whereabouts. Then Rabab was kidnapped shortly before he applied for asylum. He said that he first

learned of the abduction from his oldest daughter, Ghada, who told him over the phone that "something important happened in the family," which she would explain in a letter. El Jabali said that Ghada provided no further details during the call. Ghada's letter, which El Jabali received in September 2008—four months *after* he filed his asylum application—revealed that the problem involved Rabab and explained that Ghada had not provided details over the phone because she feared eavesdroppers. The kidnapping itself was revealed in another letter that Ghada forwarded from the kidnapper, who wrote that Hezbollah knew that El Jabali was in America, hated Hezbollah, and had not learned his lesson in 1989, so Rabab was kidnapped because "we know that she is most beloved to you" and to "teach you a lesson of depriving you from your . . . objectives of teaching your children the hatred of our resistance movement." Neither letter explains how the family initially learned about the kidnapping or discloses where Rabab was taken. But El Jabali testified that the family learned about the kidnapping from a friend of Rabab's, who Rabab had somehow managed to call and explain that she had been taken by Hezbollah to El Hermel. In contrast, El Jabali's son submitted a letter dated March 2009 stating that the family had not been able to determine Rabab's location since her abduction in March 2008.

The IJ then questioned El Jabali about the apparent inconsistency in his testimony and asylum application concerning when he learned about his daughter's kidnapping:

Q. Sir, when was the first time that you learned that your daughter was abducted, that's your daughter, Rabab?

A. Like five months after she was abducted.

Q. Okay, and through what method?

A. In, in the letter that Ghada sent me.

. . . .

Q. Now you said that you filed your asylum application because your daughter was abducted, is that right?

A. Yes.

Q. Now how could that be if you filed your application in May of 2008 and you said you didn't know that your daughter was abducted till September 2008. Can you explain that?

A. When, when I spoke to my daughter, she said that we have a big, big problem and it's concerning your life, and, and that's it, and then that's when I applied . . . . So I, so I applied for asylum in May, and then I got the letter and I found out about the abduction in September.

Q. Sir, your statement says that your daughter was abducted back in May of 2008, and you testified today that that was the reason that you applied, not because your life was in danger and there was a big problem. You said it was because your daughter was abducted. Can you explain, sir?

A. When they threatened me with my daughter, it means that they want to kill me.

Q. You didn't say that, sir.

A. When my daughter said that we are having a big problem and it's concerning your life, your safety, basically, that's, that's what it means.

When pressed again, El Jabali said that Ghada initially told him over the phone that the problem involved one of the siblings, but didn't say which one, and that he knew it had to be Rabab because she leaves the house the most often, going back and forth from college. He added that he did not remember everything that he wrote in his asylum application.

The IJ denied relief after concluding that significant inconsistencies concerning the central facts of El Jabali's claims showed that he was not credible. The IJ noted that El Jabali repeatedly testified that he did not find out about Rabab's abduction until he received Ghada's letter in September 2008, yet the affidavit attached to his May 2008 asylum application explicitly referred to the abduction and Rabab's precise location. And even if, as El Jabali testified, he somehow suspected from Ghada's phone call that Hezbollah had harmed Rabab, the court added, the petitioner did not explain how he could have known that Hezbollah had *abducted* her. The IJ added that El Jabali's testimony contradicted his application as it concerned when he resided in Lebanon.

El Jabali appealed to the BIA, arguing that the IJ had misinterpreted his testimony and thus made an adverse credibility finding based on a factual error. He asserted that he had consistently testified that Ghada's letter merely confirmed his interpretation of their conversation, through which he knew that Rabab had been kidnapped even though Ghada did not explicitly say so. And it could not be disputed that he knew about Rabab's kidnapping by May 2008, El Jabali insisted, because he stated so in his asylum application.

The BIA upheld the IJ's decision, concluding that the IJ's adverse credibility finding was not clearly erroneous. The BIA reasoned that El Jabali had not adequately explained the contradiction between his assertion in his asylum application—filed in May 2008—that he feared returning to Lebanon because his daughter had been abducted by Hezbollah, with his testimony that he was "cryptically" told earlier that month that something bad happened to his family but did not learn of the actual abduction until several months later. El Jabali moved the BIA to reconsider its decision. His filing essentially repeated the arguments he made in his initial appeal to the BIA, and the BIA denied the motion.

Our jurisdiction on appeal is limited to reviewing El Jabali's motion to reconsider. El Jabali filed a petition for review in this court on August 22, 2013, within 30 days of the BIA's July 26, 2013, order denying his motion for reconsideration, *see* 8 U.S.C. § 1252(b)(1). But his request to reconsider did not toll the time to seek judicial review of the underlying decision. *See Stone v. INS*, 514 U.S. 386, 405 (1995); *El-Gazawy v. Holder*, 690 F.3d 852, 857 (7th Cir. 2012); *Rehman v. Gonzales*, 441 F.3d 506, 508 (7th Cir. 2006). So El Jabali's petition for review is untimely as to the BIA's underlying order dated May 22, 2013, thus depriving us of jurisdiction to review that order. *See Asere v. Gonzales*, 439 F.3d 378, 380 (7th Cir. 2006); *Ajose v. Gonzales*, 408 F.3d 393, 394–95 (7th Cir. 2005).

Concerning the motion to reconsider, for which jurisdiction is secure, *see Kucana v. Holder*, 558 U.S. 233, 252-53 (2010); *Cruz-Mayaho v. Holder*, 698 F.3d 574, 576-77 (7th Cir. 2012); *Victor v. Holder*, 616 F.3d 705, 706 (7th Cir. 2010), we review the BIA's decision for abuse of discretion, 8 C.F.R. § 1003.2(a); *Gutierrez-Berdin v. Holder*, 618 F.3d 647, 652 (7th Cir. 2010); *Mungongo v. Gonzales*, 479 F.3d 531, 534 (7th Cir. 2007). "Unless the Board's decision was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis," we will deny the petition for review. *See Raghunathan v. Holder*, 604 F.3d 371, 376 (7th Cir. 2010) (internal quotation marks and citation omitted).

In his petition for review, El Jabali, through new counsel, maintains that the BIA overlooked a significant error of fact in upholding the IJ's adverse credibility finding. Contrary to the IJ's understanding, which the BIA adopted, El Jabali insists that he knew about Rabab's abduction in May 2008 (when he filed his asylum application) based on Ghada's phone call. He urges that his testimony that he was able to infer that Rabab was kidnapped from Ghada's call explains away any apparent inconsistency with his testimony that he first learned about the kidnapping from Ghada's letter, and thus the adverse credibility finding was unwarranted.

The BIA did not abuse its discretion. In his appeal to the BIA and motion to reconsider, El Jabali made the same argument. And as the BIA correctly noted, "[r]econsideration is not an appropriate forum for rehashing previously rejected arguments." *Ahmed v. Ashcroft*, 388 F.3d 247, 249 (7th Cir. 2004) (internal quotations marks and citation omitted); *see Liu v. Gonzales*, 439 F.3d 109, 111 (2d Cir. 2006); *Matter of O–S–G–*, 24 I & N Dec. 56, 58 (BIA 2006). Moreover, El Jabali's motion did not point to a specific fact overlooked by the BIA. *See* 8 C.F.R. § 1003.2(b)(1); *Ali v. Ashcroft*, 395 F.3d 722, 731 (7th Cir. 2005). Though he insists that the IJ and the BIA overlooked that he must have known about the abduction through the phone call because he mentioned the kidnapping in his asylum application, both immigration courts considered that fact and reasonably concluded that his application and testimony could not be reconciled. El Jabali's argument really boils down to his discontent that the IJ and the BIA did not believe his story. But that is not an appropriate argument for a motion to reconsider. *See Victor*, 616 F.3d at 709; *Ahmed*, 388 F.3d at 249. If El Jabali wanted this court to review the merits of the adverse credibility decision, he should have petitioned for review of the BIA's initial decision. He did not, and so we are foreclosed from reviewing the merits of the BIA's underlying decision. *See Muratoski v. Holder*, 622 F.3d 824, 829–30 (7th Cir. 2010).

Thus, the petition for review is DENIED.