[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-15161
Non-Argument Calendar
_____

Agency No. A216-030-925

HERNAN ADRIANO MEZA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(October 18, 2019)

Before JILL PRYOR, ANDERSON and HULL, Circuit Judges.

PER CURIAM:

Hernan Adriano Meza, through counsel, petitions for review of the Board of Immigration Appeals' ("BIA") decision affirming the Immigration Judge's ("IJ") denial of his motion to suppress his passport and to terminate his removal proceedings. Meza's petition for review raises three arguments: (1) that the immigration court lacked jurisdiction over his removal proceedings because his notice to appear ("NTA") did not indicate the time and date of his removal hearing, citing Pereira v. Sessions, 585 U.S. ___, 138 S. Ct. 2105 (2018); (2) that the agency improperly denied his motion to suppress; and (3) that the IJ violated his due process rights by denying his request to subpoena two ICE agents. After review, we deny Meza's petition for review.

## I.  BACKGROUND FACTS

### A.    Meza's Detention by ICE Agents

Before 6:00 a.m. on June 29, 2017, two officers approached Meza while he was walking in the parking lot of his apartment complex on his way to work. Unbeknowst to Meza, the officers were ICE agents. The agents blocked Meza's path with two cars, one in front and one in back. One of the agents grabbed Meza by the shoulder, put Meza's hand behind his back, and slammed Meza against a car. Meza does not allege, however, any injuries from this brief encounter. The ICE agents, who were wearing police vests and guns, told Meza they were police and that they were looking for a specific person. Meza, who was afraid,

2

volunteered his name and admits he voluntarily got out his Georgia identification card to show the agents he was not the person for whom they were looking.

The agents said, "let's go," and escorted Meza back to his apartment.[1]  Once at Meza's apartment door, the agents asked Meza whether he had a gun, and Meza said no.  The agents also asked him how many people were inside, and Meza told them his family was inside.  The agents asked Meza to open the door.  Meza took out his own key and unlocked and opened the door.  Meza explained that he felt threatened by the agents, who were tall and big and were wearing guns, and that he did not feel free to leave.  Meza admitted, however, that the agents did not force him to open the door or take their guns out of the holsters.  Moreover, when pressed, Meza would not state that the agents actually threatened him, saying instead only that he "felt pressure, because [he] had nowhere else to go."  Meza explained that when he opened the door, he felt afraid, but he also thought, "they say they're police, they are going to check me out, we are clean, we have no record."  Meza also does not claim that the agents handcuffed him or touched him at the apartment or that the agents were inside the apartment for a long period of time.

---

[1]Meza's declaration stated that the agents walked him back to his apartment.  Later, Meza testified at his removal hearing that the agents placed him in a car and drove him to the apartment.  But Meza also admitted he did not tell the agents his address and could not explain how the agents in the car knew where to go.

After Meza opened the door, the agents entered the apartment and checked each room, waking up Meza's family members. Meza testified that one agent said, "the passport, the passport." Meza retrieved his passport from a book inside a closet and gave it to the agents. It is this passport that is the subject of Meza's motion to suppress. The passport shows that Meza is a citizen of Peru.[2]

## B.    Notice to Appear

Also on June 29, 2017, while Meza was still in ICE custody, the Department of Homeland Security ("DHS") served Meza with an NTA, which alleged that Meza (1) was not a citizen or national of the United States; (2) was a native and citizen of Peru; (3) arrived in the United States at an unknown place on an unknown date; and (4) was not admitted or paroled after inspection by an immigration officer. The NTA charged that Meza was removable under INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled.

The NTA specified that Meza was ordered to appear before an IJ at the Immigration Court in Atlanta, with the date and time "[t]o be set." Approximately two weeks later, on July 13, 2017, Meza was served with a hearing notice ordering him to appear before the IJ on July 25, 2017, at 8:30 a.m.

---

[2]There is no claim that the passport in the record is not a valid Peruvian passport or that Meza committed fraud as to the passport.

Meza and his attorney appeared at the July 25, 2017 hearing and also at a subsequent master calendar hearing on September 19, 2017. At the master calendar hearing, Meza denied the factual allegations in the NTA, and his attorney indicated that Meza intended to move to suppress his passport on the ground that it was obtained in violation of his Fourth Amendment rights. The IJ set a removal hearing for October 26, 2017.

## C.    Motion to Suppress

Meza filed a motion to suppress the passport and terminate his removal proceedings, arguing that the passport was obtained in violation of Meza's Fourth Amendment rights. Meza attached his declaration describing his interactions with the ICE agents on June 29, 2017 and argued that the ICE agents' conduct established a "prima facie case" of an egregious constitutional violation. Meza asked for an evidentiary hearing on his suppression motion and later requested that the IJ subpoena the ICE agents to appear at the October 26, 2017 removal hearing.

The DHS opposed Meza's suppression motion. The DHS argued that the Fourth Amendment's exclusionary rule does not apply to civil deportation proceedings, citing I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1050, 104 S. Ct. 3479, 3489 (1984). Alternatively, even assuming the exclusionary rule would apply to egregious violations, Meza had not established a prima facie case that the ICE agents' conduct was an egregious violation of the Fourth Amendment.

**D.    Removal Hearing**

At the October 26, 2017 hearing, Meza renewed his request to suppress the passport and to subpoena the ICE agents.  To determine whether Meza had made a showing of a prima facie case of egregious conduct, the IJ heard testimony from Meza, as recounted above, describing how the ICE agents stopped him, escorted him to his apartment, and entered his apartment after he used his key to open the door, and how Meza gave the ICE agents his passport.

In his oral decision, the IJ denied Meza's motion to suppress and terminate removal proceedings.  The IJ concluded that Meza's evidence and testimony, when given full weight and accepted as true, did not show that the ICE agents acted egregiously.  The IJ found that: (1) the officers stopped Meza because they were looking for someone else; (2) once Meza offered his Georgia identification card, the officers realized Meza was not the person they were looking for; (3) the officers instructed Meza to walk to his apartment; (4) Meza opened the door to his apartment because the officers told him to do so and Meza was fearful; (5) Meza did not give the officers permission to search his apartment, but he "did allow the officers to go into the apartment"; and (6) Meza gave the officers his passport.

From these facts, the IJ concluded that Meza "was never forced or coerced into doing anything," but rather voluntarily opened his apartment door and gave the officers his passport.  The IJ explained that while Meza was fearful because the

6

officers carried guns, the officers were required by their profession to do so and "[t]here was no evidence the officers pointed a gun at [Meza] or forcefully opened his door, knocked it down or pointed a gun at any of the occupants in the apartment."

Because Meza had not met his burden to show a prima facie case of egregious conduct, the IJ determined it was unnecessary for the ICE agents to testify. The IJ concluded there was insufficient reason to grant Meza's motion to suppress, and, in light of the passport, found that Meza was from Peru. The IJ stated that the burden shifted to Meza to show time and manner of entry and that, in the absence of such a showing, Meza was removable from the United States under INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i).

## E.    BIA Appeal

In his counseled appeal, Meza challenged the IJ's denial of his motion to suppress and his request to subpoena the ICE agents.[3] On appeal, Meza never claimed that he was in the United States legally and does not challenge his removal on that basis. Rather, he wants to suppress the passport in order to claim the government did not prove he was from Peru.

---

[3]Meza also argued that the IJ violated his due process rights by not requiring the DHS to authenticate the passport, but he does not raise that issue on appeal and, thus, has abandoned it. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

7

The BIA dismissed Meza's appeal.  The BIA pointed out that in Lopez-Mendoza, 468 U.S. at 1050, 104 S. Ct. at 3489, "the Supreme Court held that the balance between the costs and benefits weighs against applying the exclusionary rule in removal proceedings."  The BIA, however, concluded that, based on Lopez-Mendoza, the exclusionary rule applies where the alien shows that the circumstances of the arrest or interrogation "would render the use of the evidence 'fundamentally unfair' so as to violate due process requirements of the Fifth Amendment."  The BIA explained that the fact that the evidence was obtained from a search and seizure that violated the Fourth Amendment "d[id] not necessarily mean that using the evidence in immigration proceedings is fundamentally unfair," and that "exclusion is limited to egregious violations."  The BIA concluded that Meza's declaration and hearing testimony had not met this burden.

The BIA found no clear error in the IJ's fact findings that: (1) ICE agents did not engage in coercive behavior; (2) their brief questioning of Meza in the parking lot and in his home was standard agency procedure; (3) Meza volunteered his name and identification to the ICE agents in the parking lot; and (4) Meza voluntarily unlocked the door, let the ICE agents into his home, and gave them his passport. Accordingly, the BIA concluded the ICE agents did not violate the Fourth Amendment.

8

Alternatively, the BIA concluded that, assuming a Fourth Amendment violation had occurred, that violation "was not so egregious as to render the proceedings fundamentally unfair." The BIA affirmed the IJ's denial of Meza's motion to suppress and terminate proceedings, and "[g]iven the foregoing, . . . conclude[d] that the [IJ] did not violate [Meza's] Fifth Amendment right to due process."

## II. DISCUSSION

### A.    NTA Omitting Date and Time of Hearing

On appeal and for the first time, Meza argues that the immigration court lacked jurisdiction over his removal proceedings because his NTA did not indicate the time and date of his removal hearing. In support of his jurisdictional argument, Meza cites Pereira v. Sessions, 585 U.S. ___, 138 S. Ct. 2105 (2018).[4]

This Court recently rejected the same argument Meza raises here. In Perez-Sanchez, the alien, relying on Pereira, argued that the IJ "never had jurisdiction over his removal case," because his NTA "did not include either the time or date of his removal hearing." Perez-Sanchez v. U.S. Att'y Gen., ___ F.3d ___, ___, No. 18-12578, 2019 WL 3940873, at *1 (11th Cir. Aug. 21, 2019). This Court determined that the alien's NTA was defective under INA § 239(a)(1), 8 U.S.C.

_____

[4]"We review subject matter jurisdiction de novo." Martinez v. U.S. Att'y Gen., 446 F.3d 1219, 1221 (11th Cir. 2006) (quotation marks omitted).

§ 1229(a)(1), because it did not include the hearing's date and time.  <u>Id.</u> at ___,

2019 WL 3940873, at *4.  However, this Court then concluded that the defect did

not deprive the agency of jurisdiction over the alien's removal proceedings because

the "time-and-place requirement" in INA § 239(a)(1), 8 U.S.C. § 1229(a)(1), does

not "create a jurisdictional rule."  <u>Id.</u> at ___, 2019 WL 3940873, at *4.[5]

In so holding, this Court joined eight other Circuits that have rejected the

argument that <u>Pereira</u> pronounced a broad jurisdictional rule and have concluded

that the omission of the time and place of the removal hearing from an NTA does

not deprive the immigration court of jurisdiction over removal proceedings.  <u>See</u>

<u>Pierre-Paul v. Barr</u>, 930 F.3d 684, 689-90 (5th Cir. 2019); <u>United States v. Cortez</u>,

930 F.3d 350, 363-65 (4th Cir. 2019); <u>Nkomo v. Att'y Gen.</u>, 930 F.3d 129, 133-34

(3d Cir. 2019); <u>Ali v. Barr</u>, 924 F.3d 983, 986 (8th Cir. 2019); <u>Ortiz-Santiago v.</u>

<u>Barr</u>, 924 F.3d 956, 958, 962-64 (7th Cir. 2019); <u>Banegas Gomez v. Barr</u>, 922 F.3d

101, 105, 110-12 (2d Cir. 2019); <u>Karingithi v. Whitaker</u>, 913 F.3d 1158, 1160-61

---

[5]In a provision entitled "Initiation of removal proceedings," the INA requires that an alien in removal proceedings be given a written notice to appear specifying certain information about the proceedings, including, among other things, the "nature of the proceedings," the "legal authority under which the proceedings are conducted," the "charges against the alien," and that the alien may secure his or her own representation (and include a current list of available pro bono counsel the alien may contact).  INA § 239(a)(1)(A)-(E), 8 U.S.C. § 1229(a)(1)(A)-(G). The notice to appear must also include the "time and place at which the proceedings will be held."  INA § 239(a)(1)(G)(i), 8 U.S.C. § 1229(a)(1)(G)(i).  But this provision of the INA does not speak in terms of vesting jurisdiction.

(9th Cir. 2019); Hernandez-Perez v. Whitaker, 911 F.3d 305, 314-15 (6th Cir. 2018).

The Perez-Sanchez Court also agreed with the Fourth, Fifth, and Seventh Circuits that the agency's regulation, 8 C.F.R. § 1003.14,[6] "despite its language, sets forth not a jurisdictional rule but a claim-processing one."  ___ F.3d at ___, 2019 WL 3940873, at *5-6 (explaining that "an agency cannot fashion a procedural rule to limit jurisdiction bestowed upon it by Congress"); see also Pierre-Paul, 930 F.3d at 691-93; Cortez, 930 F.3d at 358-62; Ortiz-Santiago, 924 F.3d at 963-64.  Having determined that "the IJ and the BIA properly exercised jurisdiction over [the alien's] removal hearing based on the authority conferred upon them by 8 U.S.C. § 1229a(a)(1)," this Court denied the alien's "petition for review as to his Pereira claim."  Perez-Sanchez, ___ F.3d at ___, 2019 WL 3940873, at *7.  To the extent the alien argued he was entitled to a remand

---

[6]Under 8 C.F.R. § 1003.14, entitled "Jurisdiction and commencement of proceedings," "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service."  Id. § 1003.14(a).  The regulations define "[c]harging document" as a "written instrument which initiates a proceeding before an Immigration Judge."  Id. § 1003.13.  The three documents given as examples of a "charging document" are "a Notice to Appear, a Notice of Referral to Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien."  Id.  The regulations list the information the Service must include in the notice to appear, such as the nature of the proceedings, the legal authority under which the proceedings are conducted, and the charges against the alien.  However, this list does not include the time and place of the initial hearing.  Id. § 1003.15(b).  Rather, the regulations require the Service to "provide in the Notice to Appear, the time, place and date of the initial removal hearing, where practicable."  Id. § 1003.18(b) (emphasis added).  However, "[i]f that information is not contained in the Notice to Appear, the Immigration Court shall be responsible for scheduling the initial removal hearing and providing notice to the government and the alien of the time, place, and date of hearing."  Id.

11

"because his NTA violated the agency's claim-processing rules," the Court

dismissed the alien's petition for lack of jurisdiction, explaining that the alien

"failed to exhaust the claim before the agency." Id.

Here, under Perez-Sanchez, the IJ had jurisdiction over Meza's removal

proceedings upon the filing of the initial NTA, despite the fact that the NTA did

not specify the time and date of the first hearing.  Accordingly, we deny Meza's

petition as to his Pereira claim.  To the extent Meza argues that the NTA is

defective under the agency's claim-processing rules, we dismiss his petition for

lack of jurisdiction because Meza, like the alien in Perez-Sanchez, did not exhaust

this issue before the BIA.

In any event, we note that the subsequent notice of hearing Meza received

two weeks later did specify the date and time of his next hearing at the

Immigration Court in Atlanta, and Meza and his attorney in fact appeared at that

hearing and all subsequent hearings throughout his removal proceedings.  The

subsequent prompt notice of hearing cured the defect and made the defect

harmless.  See, e.g., Pierre-Paul, 930 F.3d at 690-91 (concluding that a

subsequently sent notice of hearing containing the time and place of the removal

hearing cures any defect in the NTA); Banegas Gomez, 922 F.3d at 112 (same); In

re Bermudez-Cota, 27 I. & N. Dec. 441, 447 (BIA 2018) (same).

12

**B.**    **Motion to Suppress**

In Lopez-Mendoza, the Supreme Court held that the exclusionary rule generally does not apply to removal proceedings. Lopez-Mendoza, 468 U.S. at 1050, 104 S. Ct. at 3489. The Supreme Court explained that in determining whether the exclusionary rule extends to proceedings other than criminal proceedings, it must "weigh the likely social benefits of excluding unlawfully seized evidence against the likely costs." Id. at 1041, 104 S. Ct. at 3484. The Supreme Court concluded that the costs of excluding "concededly reliable evidence from a deportation proceeding" outweighed the likely benefits. Id. at 1042, 104 S. Ct. at 2485. The Supreme Court noted that in the deportation context, the deterrence value of the exclusionary rule was difficult to assess and significantly reduced by several factors. Id. at 1042-45, 104 S. Ct. at 2485-87. On the other hand, the "social costs of applying the exclusionary rule . . . are both unusual and significant," including, among other things, that the rule would "require the courts to close their eyes to [aliens'] ongoing violations of the law" and "clearly frustrate the express public policy against an alien's unregistered presence in this country. Even the objective of deterring Fourth Amendment violations should not require such a result." Id. at 1045-47, 104 S. Ct. at 3487-88.

However, a plurality of the Lopez-Mendoza Court suggested in dicta, and other circuits have since held, that suppression might be warranted in the case of

13

"egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." See id. at 1050-51; see, e.g., Yanez-Marquez v. Lynch, 789 F.3d 434, 448-50 (4th Cir. 2015); Oliva-Ramos v. U.S. Att'y Gen., 694 F.3d 259, 274-75 (3d Cir. 2012); Puc-Ruiz v. Holder, 629 F.3d 771, 777-78 (8th Cir. 2010); Gutierrez-Berdin v. Holder, 618 F.3d 647, 652-53 (7th Cir. 2010); Almeida-Amaral v. Gonzales, 461 F.3d 231, 234-35 (2d Cir. 2006); Gonzalez-Rivera v. INS, 22 F.3d 1441, 1448-49 (9th Cir. 1994).

Similarly, the BIA has indicated that the exclusionary rule may apply in immigration cases where the circumstances surrounding how the evidence was obtained would render the use of the evidence fundamentally unfair. See Matter of Garcia, 17 I. & N. Dec. 319, 320-21 (BIA 1980); Matter of Barcenas, 19 I. & N. Dec. 609, 611 (BIA 1988). In immigration proceedings, the party challenging the legality of the evidence must produce evidence "establishing a prima facie case before the [DHS] will be called on to assume the burden of justifying the manner in which it obtained the evidence." Barcenas, 19 I. & N. Dec. at 611.

This Court has not addressed in a published decision whether evidence of alienage (i.e., Meza's valid passport from Peru) obtained from an egregious violation of the Fourth Amendment must be excluded in removal proceedings. However, we need not decide that question in this case because here Meza has not

14

shown that the IJ and the BIA erred in finding that Meza failed to make a prima facie showing of such an egregious violation.[7]

According to Meza's version of events, the two ICE agents who stopped him in the parking lot were looking for a specific person. After Meza showed identification, the agents told Meza to take them to his apartment, which Meza did. While Meza said the agents escorted him, he did not describe any further physical contact with the agents. When the three men arrived at Meza's apartment, Meza explained to the agents that his family members were inside and assured them that he did not have a gun in the apartment. The agents told Meza to open the door, which he did, and the agents walked inside. One agent said, "the passport, the passport." Meza then took his passport from a book inside his closet and gave it to the agents.

Although Meza said that he was fearful of the agents because they were big, tall, and wearing guns, he admitted the agents did not draw their guns, force the door open, or force him to open the door. Also, while Meza said he felt threatened by the agents, he did not say the agents actually threatened him. Nothing in Meza's recounting indicates that he was subjected to abuse, coercion, racial

---

[7]Where, as here, the BIA agrees with the IJ, we review both the IJ's and the BIA's decisions. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). We review legal determinations of the agency de novo, and we review administrative fact findings under the deferential substantial evidence test. Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1236 (11th Cir. 2006). We review de novo an alien's constitutional challenges. See Lonyem v. U.S. Att'y Gen., 352 F.3d 1338, 1341 (11th Cir. 2003).

profiling, or other misconduct rising to the level of an egregious Fourth Amendment violation. Thus, even assuming arguendo that an egregious Fourth Amendment violation would warrant suppression of Meza's passport, Meza's evidence, accepted as true, does not establish such a violation occurred here.

We recognize Meza makes an independent due process argument as to the IJ's denial of his request to subpoena the two ICE agents. To prevail on a Fifth Amendment due process claim in removal proceedings, an alien must demonstrate that he was "deprived of liberty without due process of law, and that the asserted errors caused [him] substantial prejudice." Lonyem v. U.S. Att'y Gen., 352 F.3d 1338, 1341-42 (11th Cir. 2003). To establish substantial prejudice, an alien "must demonstrate that, in the absence of the alleged violations, the outcome of the proceeding would have been different." Lapaix v. U.S. Att'y Gen., 605 F.3d 1138, 1143 (11th Cir 2010); Ibrahim v. I.N.S., 821 F.2d 1547, 1550 (11th Cir. 1987).

Here, Meza failed to establish that any prejudice arose from the IJ's denial of his request to subpoena the two ICE agents who stopped him on June 29, 2017. Meza failed to explain how the outcome of his proceedings would be different if the ICE agents had testified, which was his burden. See Lapaix, 605 F.3d at 1143. In fact, in this case, the IJ credited Meza's assertions and still found that he failed to allege sufficient facts to support the contention that the ICE agents engaged in an egregious violation of his Fourth Amendment rights such that his passport

16

should be suppressed.  Furthermore, on appeal, Meza has not contested the validity of his passport.

Therefore, the IJ did not err in denying Meza's motion to suppress the passport, to subpoena the two ICE agents, and to terminate proceedings.

**PETITION DENIED.**